*860
 
 OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 This appeal tests the authority of the Superintendent of Insurance to promulgate certain new regulations respecting no-fault automobile insurance benefits, primarily those reducing the time frames for claiming and proving entitlement to such benefits. Petitioners challenge the regulations on a variety of statutory and constitutional grounds. We hold that promulgation of the challenged regulations was within the lawful authority of the Superintendent; that their adoption was undertaken in substantial compliance with the State Administrative Procedure Act; and that their specific provisions are fully consistent with the Insurance Law.
 

 I.
 

 In 1973, the Legislature enacted the Comprehensive Automobile Insurance Reparations Act
 
 {see
 
 L 1973, ch 13), which supplanted common-law tort actions for most victims of automobile accidents with a system of no-fault insurance. Under the no-fault system, payments of benefits “shall be made as the loss is incurred” (Insurance Law § 5106 [a]). The primary aims of this new system were to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts and to provide substantial premium savings to New York motorists
 
 {see
 
 Governor’s Mem approving L 1973, ch 13, 1973 McKinney’s Session Laws of NY, at 2335).
 

 For 30 years, the Superintendent has promulgated regulations implementing the No-Fault Law, presently codified in article 51 of the Insurance Law.
 

 In 1977, the Superintendent first adopted regulations establishing time frames in which to submit forms and notices pertaining to no-fault claims. Those regulations, adopted as Regulation 68 and codified at 11 NYCRR part 65, required an accident victim to submit a notice of claim to the insurer within 90 days of the accident (11 NYCRR 65.11 [m] [2]; 65.12). Proof of medical expenses for which compensation was sought was required within 180 days of the treatment received; proof of work losses as soon as reasonably practicable; and proof of other necessary expenses within 90 days after services were rendered (11 NYCRR 65.11 [m] [3]; 65.12). Late filings were permitted only when it could be shown that compliance with
 
 *861
 
 the deadlines was “impossible” due to specific circumstances beyond the claimant’s control (11 NYCRR 65.11 [m] [2], [3]; 65.12).
 

 Between 1992 and 2001, reports of suspected automobile insurance fraud increased by 275% the bulk of the increase occurring in no-fault insurance fraud. Reports of no-fault fraud rose from 489 cases in 1992 to 9,191 in 2000, a rise of more than 1700%. No-fault fraud accounted for three quarters of the 16,902 reports of automobile-related fraud received by the Insurance Department’s Frauds Bureau in 2000, and more than 55% of the 22,247 reports involving all types of insurance fraud. In 1999, the Superintendent established a No-Fault Unit within the Frauds Bureau to focus specifically on no-fault fraud and abuse. By one estimate, the combined effect of no-fault insurance fraud has been an increase of over $100 per year in annual insurance premium costs for the average New York motorist.
 

 According to the Superintendent and certain amici curiae, the most common example of the manner in which such fraud was perpetrated consisted of exploiting the time lag between the alleged loss and the deadline for submitting proof of the loss, coupled with the reality that insurers are given only 30 days to review and investigate claims before paying them without risk of penalties for denying or delaying a claim
 
 (see
 
 Insurance Law § 5106 [a]; 11 NYCRR 65-3.8). Specifically, ringleaders (often associated with organized crime) would purchase minimum automobile insurance, perhaps under a fraudulent name, on wrecked or salvaged vehicles, and recruit others to fill up the vehicles and participate in staged accidents (typically sideswipes or fender benders). These purported victims were then steered to corrupt medical clinics, called “medical mills,” where they feigned aches, pains and soft tissue injuries. The medical mills would then generate stacks of medical bills for each passenger, detailing treatments and tests that were unnecessary or never performed.
 

 Around 90 days after the staged accident, the insurer would be notified of the claim, but not of the large number of bills to follow. When the insurer investigated, only a wrecked vehicle remained. Later, just before expiration of the 180-day period for submitting proof of loss, the medical mills would submit stacks of false bills generated over six months, often reaching
 
 *862
 
 the statutory no-fault cap of $50,000 for each passenger.
 
 [1]
 
 By the time the insurer received the bills and attempted to investigate, the passenger would be pronounced cured, thus frustrating the insurer’s ability to perform its own independent medical examination in a timely fashion and forcing the insurer to choose between undertaking largely ineffective investigations and paying questionable claims. Once the bills were received, the insurer had only 30 days to pay the bills or deny the claims without risk of penalty
 
 (see
 
 Insurance Law § 5106 [a]).
 

 In 1999, in an effort to combat this widespread abuse, the Superintendent proposed an amended Regulation 68. Among the most significant changes was a reduction in the time frames applicable to the filing of notices and proofs of claim — a consequence of the Superintendent’s determination that much of the abuse was associated with the lengthy time frames within which claims could be presented to insurers. The Superintendent also concluded that the shorter time frames would better effectuate the legislative purpose of providing prompt compensation “as the loss is incurred” (Insurance Law § 5106 [a]). Petitioners successfully challenged these regulations for failure to substantially comply with the State Administrative Procedure Act
 
 (see Matter of Medical Socy. of State of N.Y. v Levin,
 
 185 Misc 2d 536 [Sup Ct, NY County 2000],
 
 affd
 
 280 AD2d 309 [1st Dept 2001]
 
 [Medical Society
 
 I]). While the appeal was pending, the Superintendent re-initiated the rulemaking process and promulgated revised Regulation 68 (repealing and replacing 11 NYCRR part 65) — the subject of the present proceeding.
 
 [2]
 

 Like the regulations invalidated in
 
 Medical Society I,
 
 the revised regulations, now in effect, reduce the time limit for filing a notice of claim from 90 to 30 days (11 NYCRR 65-1.1, 65-2.4 [b]). They also reduce the time in which to submit proof of loss due to medical treatment from 180 to 45 days, and proof of work loss from as soon as reasonably practicable to 90 days (11 NYCRR 65-1.1, 65-2.4 [c]). At the same time, the new regulations relax the standard for accepting late filings, replac
 
 *863
 
 ing the previous rule that late filings were permitted only when written proof showed that compliance with a deadline was “impossible” (11 NYCRR 65.11 [m] [2], [3]; 65.12), with a standard excusing a missed deadline when there is a “clear and reasonable justification” for the delay (11 NYCRR 65-2.4 [b] , [c]; 65-1.1).
 

 The revised regulations further specify that claims may never be denied as untimely when the reason for the delay is the failure of an employer or other third party to provide information necessary to establish proof of claim for lost wages (11 NYCRR 65-3.5 [m]). In addition, insurers are directed to establish standards for review of their determinations that notices or proofs of claim have been filed late (11 NYCRR 65-3.5 [Z]). These standards are subject to Insurance Department review and must, at a minimum, include appropriate consideration for situations where the claimant has difficulty ascertaining the insurer’s identity or inadvertently submits a claim to the incorrect insurer. Moreover, insurers are mandated to establish procedures, based on objective criteria, to ensure due consideration of denial of claims based upon late filings, including supervisory review of all such determinations. These standards, as well, are subject to the Superintendent’s review. Finally, the regulations provide that insurers must clearly notify each claimant of the new notice requirements and the opportunity to submit a justification for any late notice (11 NYCRR 65-3.4 [c] [1]).
 

 Shortly before the revised regulations were scheduled to, take effect, petitioners, by order to show cause, brought this proceeding seeking a declaration of invalidity pursuant to CPLR 3001 and annulment of the regulations pursuant to CPLR article 78. Supreme Court declared that promulgation of the revised regulations did not constitute improper legislative policymaking or an improper delegation of rulemaking authority and dismissed the petition insofar as it sought article 78 relief. The court concluded that the Superintendent had acted within the scope of his authority and jurisdiction, and that respondents had promulgated the revised regulations in substantial compliance with the State Administrative Procedure Act. The Appellate Division affirmed, as do we.
 

 II.
 

 Responsibility for administering the Insurance Law rests with the Superintendent of Insurance
 
 (see
 
 Insurance Law § 301), who has “broad power to interpret, clarify, and imple
 
 *864
 
 ment the legislative policy”
 
 (Ostrer v Schenck,
 
 41 NY2d 782, 785 [1977]). Although petitioners dispute that the substantially reduced time frames are necessary to combat concededly rampant fraud, the Superintendent’s “interpretation, if not irrational or unreasonable, will be upheld in deference to his special competence and expertise with respect to the insurance industry, unless it runs counter to the clear wording of a statutory provision”
 
 (Matter of New York Pub. Interest Research Group v New York State Dept. of Ins.,
 
 66 NY2d 444, 448 [1985]
 
 [NYPIRG]).
 
 Petitioners contend that the current regulations violate the constitutional doctrine of separation of powers; exceed the scope of the Superintendent’s authority to interpret and implement the Insurance Law; and improperly delegate rulemaking authority to private insurers in violation of the State Constitution and the State Administrative Procedure Act. We consider each of these challenges in turn.
 

 Separation of Powers
 

 The legislative power of this state is vested in the Senate and Assembly (NY Const, art III, § 1). While the Legislature may endow administrative agencies with the power to adopt regulations to implement a legislative mandate, the legislative branch may not constitutionally cede its fundamental policy-making responsibility to a regulatory agency. There is a distinction, however, between the threshold question whether the Legislature has unconstitutionally delegated its authority to an administrative agency in an enabling statute, and the related question whether, assuming the Legislature has not, the agency has exceeded the scope of its constitutionally conferred mandate “by using it as a basis for engaging in inherently legislative activities”
 
 (see Boreali v Axelrod,
 
 71 NY2d 1, 9 [1987]).
 

 Pursuant to Insurance Law § 301, “[t]he superintendent shall have the power to prescribe and from time to time withdraw or amend, in writing, regulations, not inconsistent with the provisions of [the Insurance Law]: (a) governing the duties assigned to the members of the staff of the [insurance] department; (b) effectuating any power, given to him under the provisions of [the Insurance Law] to prescribe forms or otherwise make regulations; (c) interpreting the provisions of [the Insurance Law]; and (d) governing the procedures to be followed in the practice of the department.” This broad grant of regulatory power does not cede to the executive branch fundamental legislative or policymaking authority, which
 
 *865
 
 remains at all times with the Legislature. Accordingly, the enabling statute does not violate the separation of powers.
 

 Scope of Authority
 

 Since the Legislature’s initial grant of authority to the administrative agency was constitutional, the next question is whether the Superintendent exceeded the scope of his constitutional authority by engaging in inherently legislative activity by promulgating the challenged regulations. In this regard,
 
 Boreali
 
 is instructive.
 

 In
 
 Boreali,
 
 the Public Health Council — authorized by its enabling statute to establish sanitary regulations “dealing] with any matters affecting the * * * preservation and improvement of public health” (Public Health Law § 225 [5] [a])— promulgated a comprehensive code to regulate tobacco smoking in areas open to the public, thereby “effectuating] a profound change in social and economic policy”
 
 (Boreali,
 
 71 NY2d at 8). The Council acted following the Legislature’s failure to adopt any comprehensive laws governing smoking and so, without any legislative guidance, reached its own conclusions about the proper accommodation among nonsmokers, smokers, affected businesses and the public. “Even under the broadest and most open-ended of statutory mandates, an administrative agency may not use its authority as a license to correct whatever societal evils it perceives”
 
 (id.
 
 at 9). The Council exceeded the scope of its constitutional authority in “drafting a code embodying its own assessment of what public policy ought to be”
 
 (id.),
 
 thus transgressing “the difficult-to-define line between administrative rule-making and legislative policy-making”
 
 (id.
 
 at 11).
 

 Here, by contrast, the Superintendent did not promulgate regulations on a blank slate without any legislative guidance, nor did the revised regulations effectuate a profound change in social and economic policy. “The cornerstone of administrative law is derived from the principle that the Legislature may declare its will, and after fixing a primary standard, endow administrative agencies with the power to fill in the interstices in the legislative product by prescribing rules and regulations consistent with the enabling legislation”
 
 (Matter of Nicholas v Kahn,
 
 47 NY2d 24, 31 [1979]). That occurred here.
 

 According to petitioners, however, only the Legislature, not the Superintendent, may prescribe time limits for filing no-fault
 
 *866
 
 claims.
 
 [3]
 
 But contrary to petitioners’ contention, the absence of a specific statutory delegation of authority to establish time frames does not bar the challenged regulations. The Superintendent has, for more than 25 years and without any interference from the Legislature, promulgated regulations— never before challenged — establishing notice and proof-of-claim periods. The Legislature’s failure to enact time limits, despite having repeatedly considered doing so, thus evinces a legislative preference to yield to administrative expertise in filling in an interstice in the statutory scheme by the setting of such limits. New York regulators have commonly filled in statutory interstices by prescribing time limits when an enabling statute has been silent.
 
 [4]
 

 Nor do the reduced time limits unlawfully create a new class of exclusion from coverage. Insurance Law § 5103 (b) lists the permissible categories of persons who may be excluded from no-fault coverage. In
 
 Servido v Superintendent of Ins.
 
 (53 NY2d 1041 [1981],
 
 revg on dissenting op
 
 77 AD2d 70, 76-86 [1st Dept 1980]), we held that the Superintendent has no power to create any new exclusion by regulation. There, the Superintendent had promulgated a regulation excluding from coverage uninsured family members, a class of persons not enumerated in Insurance Law § 5103 (b). Here, however, the challenged regulations create not a new category of exclusion, but rather merely a condition precedent with which all claimants must comply in order to receive benefits under the statute.
 

 Nevertheless, petitioners assert that the reduced time frames adopted by the Superintendent will have the effect of denying benefits to innocent accident victims who fail to meet the shortened deadlines. Of course, any limitation period, including the
 
 *867
 
 longer period in existence since 1977, will, by definition, result in some time-barred claims. But because the Superintendent’s determination does not run counter to the clear wording of any statutory provision, his expert judgment that the reduced time frames will not have the effect of excluding a significant number of legitimate claims is not to be second-guessed by the courts. As represented at oral argument by counsel for respondents, in the year and a half that the regulations have been in effect, petitioners’ predictions that thousands of innocent accident victims will fail to meet the new filing deadlines and be denied benefits, or that hospitals or other medical providers will prove unable to bill for services within 45 days, appear not to have materialized. In any event, the Superintendent has determined that the revised regulations are the most effective means of advancing the legislative intent of providing prompt payment of benefits as the loss is incurred, while reducing rampant abuse. That being so, this Court may not substitute its judgment for that of the Superintendent, but may determine only whether the Superintendent acted within the scope of his lawfully delegated authority. Since the Superintendent’s determination was neither irrational nor unreasonable,
 
 [5]
 
 neither arbitrary nor capricious, the regulations must be upheld.
 

 Delegation of Rulemaking Authority
 

 Article IV, § 8 of the New York State Constitution mandates that “[n]o rule or regulation made by any state department * * * shall be effective until it is filed in the office of the department of state.” State Administrative Procedure Act § 102 (2) (a) (i), in turn, defines a “rule” as “the whole or part of each agency statement, regulation or code of general applicability that implements or applies law, or * * * the procedure or practice requirements of any agency, including the amendment, suspension or repeal thereof.”
 

 Petitioners contend that in requiring insurers to establish standards for reviewing late-filed claims
 
 (see
 
 11 NYCRR 65-3.5 [Z]), the revised regulations improperly delegate rulemaking authority to private companies. They further argue that the failure of the Superintendent to file these insurer standards as “rules” with the Department of State and to publish them in
 
 *868
 
 the New York Codes, Rules and Regulations violates the State Constitution and State Administrative Procedure Act.
 

 In
 
 Matter of New York City Tr. Auth. v New York State Dept. of Labor
 
 (88 NY2d 225, 229 [1996]
 
 [NYCTA]),
 
 we held that “only a fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers constitutes a rule or regulation” that must be promulgated in conformance with article IV, § 8 of the State Constitution and in substantial compliance with the State Administrative Procedure Act.
 

 Here, the actual “rule” — that late filing must be excused upon a showing of “clear and reasonable justification” for the delay — has been duly promulgated by the Superintendent and adopted and published in compliance with the Constitution and State Administrative Procedure Act. This standard is significantly more flexible than that contained in the former regulations, in which late filing could be excused only when compliance with a deadline was “impossible.” Also incorporated into the revised regulations is the fixed, general principle that claims may never be denied as untimely when the reason for the delay is the failure of an employer or other third party to provide information necessary to establish proof of claim for lost wages
 
 (see
 
 11 NYCRR 65-3.5 [m]).
 

 Contrary to petitioners’ contention, the Superintendent’s further action in directing that insurers establish objective standards for reviewing late claims does not delegate rulemaking authority within the meaning of the State Administrative Procedure Act. Rather, this requirement affords additional protection to claimants by ensuring that insurers cannot deny claims based on subjective or arbitrary criteria. By regulation, the insurers’ standards must — at a minimum — include appropriate consideration for situations where the claimant has difficulty ascertaining the insurer’s identity or inadvertently submits a claim to the incorrect insurer (11 NYCRR 65-3.5 [Z]). Moreover, insurers must establish procedures, based on objective criteria, to ensure due consideration of denial of claims based upon late filings, including supervisory review of all such determinations.
 

 Since these standards encompass case-specific mitigating factors and vest the decisionmakers with significant discretion with which to independently exercise their professional judgment, the standards constitute not “rules” but guidelines
 
 (see
 
 
 *869
 

 NYCTA,
 
 88 NY2d at 229-230;
 
 Matter of Schwartfigure v Hartnett,
 
 83 NY2d 296, 301 [1994]). “Choosing to take an action * * * based on individual circumstances is significantly different from implementing a standard or procedure that directs what action should be taken regardless of individual circumstances”
 
 (Matter of Alca Indus. v Delaney,
 
 92 NY2d 775, 778 [1999]). Accordingly, the standards need not be filed with the Department of State.
 

 Nor is self-regulation by private parties forbidden, as long as the delegation of authority is properly circumscribed by agency oversight. As this Court noted in
 
 8200 Realty Corp. v Lindsay
 
 (27 NY2d 124, 131-132 [1970]), “That members of a complex industry play a part in guiding government to a fair regulation of the industry is an obvious advantage as long as government keeps the ultimate controls in its own hands. The knowledge and experience of the industry may be of valuable assistance to administration. The co-operation of the industry is more likely when the industry plays a responsible part in the regulation itself than when it stands outside and takes the prescriptions of public authority when handed down.” Here, the revised regulations provide that insurer standards will come under review by the Insurance Department, the actual rulemaking authority. In addition, disputes about untimely no-fault submissions will be subject to an expedited arbitration, and the Superintendent has stated his intention to monitor those arbitration filings.
 

 State Administrative Procedure Act
 

 Article 2 of the State Administrative Procedure Act governs administrative rulemaking in New York. Pursuant to State Administrative Procedure Act § 202 (8), each rule or regulation proposed by an agency must be promulgated “in substantial compliance” with State Administrative Procedure Act §§ 202 (setting forth general procedures for rulemaking), 202-a (requiring consideration of the regulatory impact of the proposed rule), and 202-b (requiring consideration of regulatory flexibility for small businesses). Petitioners allege that the promulgation of the revised regulations did not comport with this statutory standard. According to petitioners, respondents failed to analyze alternative approaches raised in public comments made pursuant to State Administrative Procedure Act §§ 202-a, 202-b, and 202 (5); failed to supply an adequate Regulatory Impact Statement (RIS) and Regulatory Flexibility Analysis (RFA) that described the “needs and benefits” of the
 
 *870
 
 revised regulations, as required by State Administrative Procedure Act §§ 202-a and 202-b; failed to amend the RIS and RFA, as required by State Administrative Procedure Act § 202 (5) (c); and failed to provide a “best estimate” of the costs of the proposed regulations, as required by State Administrative Procedure Act § 202-a (3) (c) (iv).
 

 The record reveals, however, that the revised regulations were indeed promulgated in substantial compliance with the State Administrative Procedure Act. During the rulemaking process, respondents — having received public comments from a wide array of interests and in an attempt to cure the procedural shortcomings identified in
 
 Medical Society
 
 I — made substantive revisions to the proposed regulations and issued a Notice of Revised Proposed Rulemaking that contained a Revised Regulatory Impact Statement, a Revised Regulatory Analysis for Small Businesses and Local Governments, a Revised Job Impact Statement, a Revised Rural Area Flexibility Analysis, and an Assessment of Public Comments. The Revised RIS included a statement of alternative suggestions received during the public comment period and an explanation of why most were not adopted; identified suggestions received that were adopted and incorporated into the final version of the revised regulations; and contained statements regarding the potential costs and paperwork implications of the revised regulations for insurers, self-insurers, health care providers, and claimants.
 

 The Revised RFA, too, discussed the impact that the revised regulations may have on small businesses, including health care providers, transportation companies, billing agencies, attorneys, and local governments, and concluded that any increased costs associated with the revised regulations would likely be offset by greater efficiencies in the claims process, more prompt payment of benefits, and reductions in systemic fraud and abuse. The Assessment of Public Comments responded to a variety of public comments and set forth the reasons why the Insurance Department regarded some suggestions as unworkable or less efficacious than those proposed in the revised regulations. In response to comments that the time period for comment was too short, respondents extended the public comment period for an additional 15 days.
 

 III.
 

 In addition to the provisions relating to filing deadlines, the new regulations amended certain other provisions of the regulatory scheme, several of which petitioners contend violate the Insurance Law.
 

 
 *871
 
 Pursuant to Insurance Law § 5106 (a), benefits are overdue if not paid by the insurer within 30 days after submission of proof of loss
 
 (see also
 
 11 NYCRR 65-3.8). The statute further provides that all overdue payments shall bear interest at the rate of two percent per month
 
 (see
 
 Insurance Law § 5106 [a]). Under the revised regulations, this interest is no longer to be compounded, as before, but is instead to be calculated as simple interest (11 NYCRR 65-3.9 [a]). Since the statute is silent as to whether the interest is to be simple or compounded, the regulations in no way conflict with the statute. Indeed, we note that the prior provision for compound interest was itself set by regulation (11 NYCRR 65.15 [h] [1]).
 

 Insurance Law § 5106 (a) further provides that if a valid claim or portion is overdue, claimants shall also be entitled to recover reasonable attorney fees “for services necessarily performed in connection with securing payment of the overdue claim,
 
 subject to limitations promulgated by the superintendent in
 
 regulations” (emphasis added). Under the revised regulations, attorney fees are no longer to be paid to a health care provider who submits claims in excess of the applicable fee schedules established pursuant to Insurance Law § 5108, except when the charges involve interpretation of the schedules or inadvertent miscalculation or error (11 NYCRR 65-4.6 [i]). This amendment was adopted in order to deter health care providers from overcharging by filing claims in excess of the amount to which they are statutorily entitled, and constitutes a permissible “limitation [] promulgated by the superintendent in regulations” (Insurance Law § 5106 [a]).
 

 The new regulations no longer permit the assignment to health care providers of benefits for non-health-related services (typically housekeeping and transportation expenses) (11 NYCRR 65-3.11 [a]; Insurance Law § 5102 [a] [1]). Such reasonable and necessary expenses remain reimbursable
 
 (see
 
 Insurance Law § 5102 [a] [3]), although nonassignable, and necessary medical and health-related no-fault benefits remain assignable and therefore subject to direct payment to health care providers by insurers
 
 (see
 
 11 NYCRR 65-3.11 [a]). Nevertheless, petitioners argue that this restriction violates General Obligations Law § 13-101, which provides that “[a]ny claim or demand can be transferred” unless such transfer is expressly forbidden by statute or “contravene [s] public policy.” Here, the Superintendent has determined that the restriction is necessary to reduce abuses in the payment of benefits for non-health-related services, particularly with respect to questionable
 
 *872
 
 claims for transportation or housekeeping expenses, and that permitting assignment of such claims thus contravenes public policy. This determination is not irrational or unreasonable, and must therefore be upheld in deference to the Superintendent’s special competence and expertise with respect to the insurance industry (see
 
 NYPIRG,
 
 66 NY2d at 448).
 

 Finally, Insurance Law § 5106 (b) provides that “[e]very insurer shall provide a claimant with the option of submitting any dispute involving the insurer’s liability to pay * * * benefits * * * the amount thereof or any other matter which may arise [with respect to overdue benefits] to arbitration pursuant to simplified procedures to be promulgated or approved by the superintendent.” The revised regulations thus provide that arbitrators may issue subpoenas on their own initiative, and “may raise any issue that the arbitrator deems relevant to making an award that is consistent with the Insurance Law and department regulations” (11 NYCRR 65-4.4 [e]). Petitioners argue that this aspect of the revised regulations undermines Insurance Law § 5106 (b), which they read to provide claimants with the option of deciding which issues may be submitted to arbitration. But the statute requires only that insurers provide claimants with the option of arbitration. Once a claimant resorts to arbitration, the statute neither entitles the claimant to withhold relevant evidence nor precludes inquiry into issues the arbitrator deems relevant.
 

 In short, we agree with Supreme Court and the Appellate Division in rejecting petitioners’ challenges. Regulation 68 does not transgress the lawful authority of the Superintendent of Insurance or the State Administrative Procedure Act.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Judges Smith, Ciparick, Rosenblatt, Grafpeo and Read concur.
 

 Order affirmed, with costs.
 

 [1]
 

 . A second common form of no-fault fraud involved padding otherwise legitimate claims with unnecessary and excessive office visits and diagnostic tests.
 

 [2]
 

 . Days before the effective date of September 1, 2001, Supreme Court stayed enforcement of the revised regulations. On April 4, 2002, however, the Appellate Division denied petitioners’ motion for a further stay, and the regulations have been in effect since that date.
 

 [3]
 

 . We note that in 1997, the Legislature considered legislation to reduce the time frames for the filing of no-fault claims to those since adopted by the Superintendent. In opposing that legislation, one of the petitioners here argued before the Legislature that the proposed statute “unnecessarily usurp [s] the authority vested in the Superintendent of Insurance to promulgate those regulations deemed to be necessary to implement the No-Fault Reparations Act * * * and in the absence of any proposed amendment to his regulation, the Legislature should refrain from substituting its judgment as to what the time limits for timely notice should be in this area.”
 

 [4]
 

 .
 
 See e.g.
 
 22 NYCRR 202.16 (g) (setting time limit for responses to demands for expert information in matrimonial proceedings, despite silence of CPLR 3101 [d]); 22 NYCRR 202.12 (b) (setting time limit for preliminary conference not provided for in CPLR); 10 NYCRR 63.4 (a) (setting time limit for medical examiners to report HIV infection as required by Public Health Law § 2786); 18 NYCRR 387.14 (setting time limit for food stamp eligibility, despite silence of Social Services Law § 95).
 

 [5]
 

 . We note that in another context, the Legislature itself has established a time limit of 30 days for providing notice of a claim for benefits
 
 (see
 
 Workers’ Compensation Law § 18).