OPINION OF THE COURT
Raymond Guzman, J.
The five petitioners aver that they are medical professional corporations duly organized and incorporated in New York State under article 15 of the Business Corporation Law. By order to show cause and verified petition, filed on March 13, 2007, they move under CPLR 2304 for an order quashing or modifying six grand jury subpoenas duces tecum, dated November 28, 2006, issued by the New York State Attorney General (AG) on behalf of the Kings County Grand Jury.
The petitioners assert that they have complied with the subpoenas, except with respect to materials which the petitioners claim are protected from disclosure under the State’s physician-patient privilege (codified at CPLR 4504). The AG agreed to adjourn compliance with the subpoenas, which were originally returnable on December 12, 2006, pending resolution of the petitioners’ instant application.
In their initial papers, the petitioners also sought an order under CPL 610.25, requiring the AG to return certain records seized on November 28, 2006, during the execution of search warrants[1] at medical offices located at 21 West 39th Street, Manhattan, and at 401 76th Street, Nos. 1A and 1H, Brooklyn.
The petitioners’ papers were referred to this court on April 3, 2007. On May 1, 2007, the AG filed a verified answer and memorandum of law opposing the petitioners’ application. On May 23, 2007, the petitioners filed a reply affirmation and memorandum of law in support of their application to quash or modify the subpoenas, but withdrew without prejudice their request for related relief under CPL 610.25. This court declined the parties’ joint offer to present oral arguments.
This court has reviewed the papers filed by both parties, including the exhibits appended thereto, and for the reasons set forth below, denies the petitioners’ application to quash or modify the subject subpoenas duces tecum, except to the extent the petitioners make the showing as provided herein.
*184 Background
The subject subpoenas were issued as part of the AG’s investigation into the activities of several medical clinics which specialize in treating motor vehicle accident claimants under New York State’s statutory “no-fault” (or personal injury protection) insurance system, codified under article 51 of the Insurance Law.
The No-Fault Law, which took effect in 1974, requires the owner of a vehicle registered in New York to carry insurance to cover “economic losses” (medical and other injury-related expenses) sustained by the occupant(s) of such vehicle, and/or by any pedestrian(s), injured as a result of the use or operation of such vehicle, up to a maximum of $50,000 per person, without regard to fault; recourse through the courts is neither necessary nor permitted, except to recover actual economic losses if they exceed no-fault benefits, and/or to seek compensation for noneconomic losses (pain and suffering) if the injury suffered meets the statutory definition of “serious.”[2] (See Insurance Law § 5104.) The injured party may assign the right to claim payment for medical expenses to the medical service provider.
The Legislature’s purpose in enacting the No-Fault Law was threefold: “to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts and to provide substantial [auto insurance] premium savings to New York motorists” (Matter of Medical Socy. of State of N.Y. v Serio, 100 NY2d 854, 860 [2003], citing Governor’s Mem approving L 1973, ch 13, 1973 McKinney’s Session Laws of NY, at 2335; see also, e.g., Pommells v Perez, 4 NY3d 566, 570-571 [2005]).
In operation, however, the no-fault system proved increasingly vulnerable to fraud. As the Court of Appeals recognized in *185 Medical Socy. of State of N.Y. v Serio (100 NY2d at 861), and reiterated in Pommells v Perez (4 NY3d at 571),
“[rjeports of no-fault fraud rose from 489 cases in 1992 to 9,191 in 2000 . . . account[ing] for three quarters of the 16,902 reports of automobile-related fraud received by the [New York State] Insurance Department’s Frauds Bureau in 2000, and more than 55% of the 22,247 reports involving all types of insurance fraud.”
The Court noted that such fraud is perpetrated at the expense of New York motorists, citing one estimate calculating that “the combined effect of no-fault insurance fraud has been an increase of over $100 per year in annual insurance premium costs for the average New York motorist” (Medical Socy. of State of N.Y. v Serio, 100 NY2d at 861).
As the Court also noted, the problem became such that in 1999, an office was established within the Insurance Department to focus exclusively on no-fault fraud (id.). The State launched other administrative antifraud initiatives as well. In 1998, the Superintendent of Insurance promulgated regulations requiring insurers, inter alia, to develop and implement “Fraud Prevention Plans”; establish full-time “Special Investigation Units” to investigate suspected fraud; and submit fraud data and reports on the results of their antifraud activities to the Insurance Department. (See 11 NYCRR 86.6.) In 2001, the Governor appointed the AG as Special Prosecutor to coordinate the investigation and prosecution of auto insurance fraud in cooperation with the Insurance Department, local district attorneys, and other state agencies. (See Executive Order [Pataki] No. 109 [9 NYCRR 5.109].)
In its instant papers, the AG describes a “typical” no-fault auto insurance fraud scheme as one in which “steerers” solicit auto accident victims, or individuals willing to pose as accident victims, to seek treatment at corrupt no-fault medical clinics, in return for a fee; the clinics then submit claims to insurance companies for providing such patients with medical services which may have been unnecessary, and/or performed by unlicensed practitioners, and/or not performed at all. The clinics may also instruct patients to seek treatment for at least three months, even when unwarranted, in order to establish their alleged injuries as “serious” under the no-fault statutory definition (see n 2, herein), and may refer patients to attorneys, in return for a fee, to pursue fraudulent lawsuits for alleged economic losses in excess of $50,000, and/or for noneconomic losses due to alleged “pain and suffering.”
*186 The AG avers that the investigation in connection with the case at bar has to date revealed that a man named Jacob Kagan owns six no-fault medical clinics in contravention of state law prohibiting a person who is not a licensed physician or medical provider from owning a medical clinic (Business Corporation Law §§ 1507, 1508), and that he disguises his ownership by controlling the clinics through management companies; one such company, Mirka United, Inc., is allegedly the leaseholder to the premises[3] subject to the search warrants executed by the AG on November 28, 2006 (referenced supra). The AG alleges that Mr. Kagan hires and supervises medical personnel at these clinics; pays “steerers” to locate patients; pays patients to undergo treatment; dictates treatment and diagnostic testing; bills insurance companies for medically unnecessary treatments and for services not rendered; and regularly refers patients to affiliated personal injury attorneys who pursue fraudulent claims.
The subject subpoenas,[4] copies of which are included in the petitioners’ papers, command the petitioners to produce materials itemized under headings entitled, “Corporate Records,” “No-Fault Claim Records,” “Patient Files,” “Patient Sign-In Sheets,” “Bank and Tax Records,” and “Calendars, Appointment Books and Telephone Books.”
The Physician-Patient Privilege CPLR 4504 (a) provides, in pertinent part, that
“[ujnless the patient waives the privilege, a person authorized to practice medicine, registered professional nursing, licensed practical nursing, dentistry, podiatry or chiropractic shall not be allowed to disclose any information which he acquired in attend *187 ing a patient in a professional capacity, and which was necessary to enable him to act in that capacity.”
The law specifies that the physician-patient relationship exists between a professional service corporation organized under article 15 of the Business Corporation Law to practice medicine, and the patients to whom it fenders professional medical services. The law further provides that a patient who authorizes the disclosure of any such privileged communication for the purpose of obtaining insurance benefits shall not be deemed to have waived the privilege.
“The purpose of the privilege ‘is to protect those who are required to consult physicians from the disclosure of secrets imparted to them, to protect the relationship of patient and physician, and to prevent physicians from disclosing information which might result in humiliation, embarrassment, or disgrace to patients’ ” (Prince, Richardson on Evidence § 5-302, at 248 [Farrell 11th ed], quoting Steinberg v New York Life Ins. Co., 263 NY 45, 48-49 [1933]; Matter of Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984, 69 NY2d 232, 239 [1987], cert denied sub nom. Y & X v Kuriansky, 482 US 928 [1987]). “Its purpose is to encourage full disclosure by the patient, so that the physician can advise and treat correctly.” (Id. at 249, citing Matter of Camperlengo v Blum, 56 NY2d 251, 254 [1982].)
The Application to Quash the Subpoenas in the Case at Bar
The petitioners ask that the subpoenas be quashed or modified on the grounds that they (1) seek information protected from disclosure under CPLR 4504, and (2) are overly broad. In their initial papers, the petitioners specifically objected only to producing the subpoenaed patient files and no-fault claim records, but in their reply affirmation, the petitioners add that the subpoenaed patient sign-in sheets, appointment books, and calendars also contain information protected from disclosure; the petitioners contend that “even assuming arguendo, as is put forth [by the AG], that the mere names of patients and dates of treatment are not privileged,” these records should be protected to the extent that they reveal the nature of patient diagnosis or treatment.
To support their contention that these records contain information privileged under CPLR 4504, the petitioners submitted *188 five redacted “sample” copies of “consultation reports”[5] from the subpoenaed patient files with their reply affirmation papers, and assert that by having done so, they have “obviate[d] the necessity of an exhaustive judicial in camera examination of the subpoenaed records to determine whether there is any particularized need for production of privileged parts thereof,” citing Matter of Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984 (69 NY2d 232 [1987], supra).
The petitioners argue that there is no exception to the statutory physician-patient privilege which would permit them to disclose the records whose production they contest, relying heavily on appellate court decisions which have (1) ruled that the privilege is to be given “a broad and liberal construction to carry out its policy,” citing Matter of Grand Jury Investigation in N.Y. County (98 NY2d 525 [2002]), People v Sinski (88 NY2d 487 [1996]) and Matter of Grand Jury Investigation of Onondaga County (59 NY2d 130 [1983]); (2) narrowly construed statutes limiting the privilege, citing Matter of Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984 (supra) and Matter of Application to Quash Grand Jury Subpoena (239 AD2d 412 [2d Dept 1997]); and (3) specifically rejected claims that there is a “public interest exception” to CPLR 4504, including any exception “for grand jury proceedings or criminal investigations generally,” citing Matter of Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984 (69 NY2d at 239), and Matter of Grand Jury Investigation of Onondaga County (59 NY2d at 135-136).
The petitioners acknowledge that the courts have created an exception to the privilege in Medicaid and Medicare fraud investigations, citing Matter of Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984 (supra) and People v Bhatt (160 Misc 2d 973 [Sup Ct, Queens County 1994]), but maintain that there is no rationale for extending this exception to no-fault insurance fraud investigations. They assert that the situations are not analogous because (1) New York’s no-fault insurance program provides a system for the payment of contested claims, citing 11 NYCRR part 65; (2) Medicaid and Medicare impose stringent record-keeping requirements on participating health care providers, which are not imposed on health care providers seeking payment from no-fault insurance carriers; and (3) there *189 are no public funds at issue in the payment of no-fault insurance claims. The petitioners contend that unlike Medicaid/ Medicare fraud, no-fault insurance fraud victimizes “not the state and not the patients,” but only private insurance companies, and declare that “this [defrauding of insurance companies] is hardly a sufficient competing interest to justify the abrogation of a privilege of confidentiality long held sacrosanct by the legislature and the courts.”
In addition, the petitioners opine that no-fault fraud can be combated without access to patient records, and although they do not explain how, suggest that if the AG believes otherwise, insurance carriers should seek waivers from “their insureds-patients.” The petitioners posit that compelling the disclosure of records from clinics specializing in the treatment of vehicular-accident injuries will serve only to chill accident victims from seeking evaluation and treatment, and lead to more cursory record keeping.[6]
The petitioners offer no arguments to support their allegation that the subpoenas in the instant case should be quashed or modified on the ground that they are “overly broad.”
The AG’s Response
The AG points out that a grand jury subpoena is “presumptively valid,” citing Matter of Comprehensive Habilitation Servs. v Attorney Gen. of State of N.Y. (278 AD2d 557, 558 [3d Dept 2000]), and that “the burden is upon the party seeking to quash such subpoena to demonstrate its issuance in bad faith or its invalidity upon some other legitimate basis,” citing Matter of Doe v Kuriansky (91 AD2d 1068, 1068 [2d Dept 1983], affd 59 NY2d 836 [1983]). The AG argues that the application to quash or modify the subpoenas in the case at bar should be denied because the petitioners, who do not allege bad faith, have failed to demonstrate the invalidity of the subpoenas on any other legitimate basis. Specifically, the AG challenges the claim of physician-patient privilege as a legitimate basis because (1) the petitioners have failed to meet their burden in pleading the physician-patient privilege, and/or (2) the privilege should not apply to no-fault insurance fraud investigations.
*190 The AG notes that in order to assert the physician-patient privilege, the petitioners bear the burden of showing “the existence of circumstances justifying its recognition,” citing Koump v Smith (25 NY2d 287, 294 [1969]), i.e., that (1) a physician-patient relationship existed between the medical provider and the patient; (2) the information in question was obtained during the course of treatment; and (3) the information was necessary for diagnosis and treatment, citing People v Decina (2 NY2d 133, 141 [1956]) and Dillenbeck v Hess (73 NY2d 278, 287 [1989]). The AG asserts that the petitioners have failed to satisfy this burden because they “have identified no records meeting these criteria” and do not argue that “the privilege applies with respect to the records as a whole.”[7] The AG also notes that the privilege does not cover information transmitted when doctors and patients communicate for purposes other than providing/ obtaining legitimate medical treatment, i.e., for the purpose of perpetrating fraud, and where the capacity in which the physician attends to the patient is not that of a medical provider but rather that of an “enterprise conspirator.”
The AG further argues that even if the petitioners have sufficiently pleaded the physician-patient privilege, the privilege should not apply to no-fault fraud investigations.
The AG concedes that there is no exception to the physician-patient privilege for the grand jury, nor for criminal investigations generally, but urges that because the invocation of evidentiary privileges in the grand jury “exact a heavy toll. . . because they keep otherwise competent evidence from the reach of the grand jury and the courts” citing 8 Wigmore, Evidence § 2380a (Chadbourn rev 1974) and Matter of Grand Jury Proceedings (Doe) (56 NY2d 348, 352 [1982]), the privilege should not apply where it will not serve to further the legitimate purposes for which it was created. In this regard, the AG notes that our courts have carved out and extended exceptions to evidentiary privileges where important public interests are at stake, citing People v Bhatt (160 Misc 2d 973 [1994], supra), extending the abrogation of the physician-patient privilege in Medicaid fraud investigations to Medicare fraud investigations.
The AG maintains that the underlying purpose of the physician-patient privilege will not be subverted by ruling that it does not apply in no-fault insurance fraud investigations; to *191 the contrary, the AG posits that such a ruling could not encourage less candid patient-physician communications where they have not been candid in the first place, and would not deter honest accident victims, whom the AG submits would prefer not to undergo unnecessary treatments “to enable a scam,” from seeking medically appropriate care. Moreover, the AG notes, records produced for grand jury consideration are “cloaked with secrecy” by law (CPL 190.25 [4] [a]).
The AG also maintains that the public’s interest is as much at stake in the investigation of no-fault insurance fraud as it is in the investigation of Medicaid/Medicare fraud, noting that both programs are state mandated and heavily government regulated, and that the consumer is the ultimate victim of fraud in either — disputing the petitioners’ assertion that no-fault fraud merely victimizes insurance companies. The AG points out, inter alia, that in the executive order creating the Auto Insurance Fraud Unit (within the AG’s office), former Governor Pataki specifically declared that it was in the “public interest” for the AG to investigate “fraudulent motor vehicle insurance claims,” which “harm! ] consumers, health care providers and insurers by increasing insurance costs,” perhaps “cost[ing] the average New York consumer hundreds of dollars per year in higher premiums” (9 NYCRR 5.109).
The AG asserts that no-fault fraud, like Medicaid/Medicare fraud, cannot be detected without scrutinizing patient records. Citing the decision in Matter of Doe v Kuriansky (91 AD2d 1068 [1983], supra), for example (denying an application to quash a grand jury subpoena duces tecum in connection with a Medicaid fraud investigation), the AG notes that the Appellate Division, Second Department, specifically found that access to otherwise privileged information contained in patient records was essential to determining whether Medicaid had been fraudulently billed, e.g., for services not rendered. The AG asserts that access to information in patient records is likewise essential to determining whether no-fault insurance companies have been fraudulently billed for such services. The AG notes that the ruling in Matter of Doe was restated in Matter of Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984 (69 NY2d at 241), when the Court of Appeals declared that “[i]t is only in the rare instance where the record sought contains highly sensitive matter having no apparent relevance to the Medicaid investigation, that a claim of privilege need be considered.”
Finally, the AG urges that even if this court finds that the physician-patient privilege applies to the contested records in *192 the case at bar, and even if this court declines to create an exception to the privilege in no-fault fraud investigations, that the subject subpoenas be modified so as to permit investigators to review as much data as possible; in this regard, the AG notes that the Court of Appeals has specifically ruled that “the identity of patients as well as the dates of treatment is not covered by the physician-patient privilege,” citing Matter of Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984 (69 NY2d at 241).
In sum, the AG contends that the application of the physician-patient privilege to no-fault fraud investigations will further no legitimate purpose while “significantly hindering, if not completely barring, no-fault fraud investigation.”
Discussion and Decision
Unlike the attorney-client privilege (codified at CPLR 4503), “the oldest of the privileges for confidential communications known to the common law” (see, e.g., United States v Jacobs, 117 F3d 82, 87 [2d Cir 1997]), the physician-patient privilege (codified at CPLR 4504) was not recognized in the common law, and as such, is entirely a creature of state statute, rooted in public policy. (See, e.g., Dillenbeck v Hess, 73 NY2d at 283-286.) Accordingly, when considering the proper application of the privilege, the public policy goals underlying its enactment must be kept in mind: as the petitioners themselves note, the Court of Appeals has ruled that the privilege is to be given a “broad and liberal construction to carry out its policy” (Matter of Grand Jury Investigation in N.Y. County, 98 NY2d at 530 [emphasis added]). In this court’s view, the policy goals did not include the creation of a shield behind which physicians could exploit patient communications, with or without patient complicity, to perpetrate fraud. It is nevertheless true that while there is a well-established “crime-fraud exception” to the attorney-client privilege, which “removes the privilege from those attorney-client communications ... in furtherance of contemplated or ongoing criminal or fraudulent conduct” (United States v Jacobs, 117 F3d at 87), there is as yet no parallel recognized exception to the physician-patient privilege.
However, as both parties in the instant case have discussed, the courts have created exceptions to the physician-patient privilege applicable to the investigation of certain type(s) of fraud, i.e., in the Medicaid and Medicare programs, grounded on the theory that the state and federal regulatory provisions of these programs evince the intent to abrogate the privilege to satisfy *193 the public interest in assuring that funds are not “fraudulently diverted into the hands of an untrustworthy provider of [medical] services” (People v Bhatt, 160 Misc 2d at 981).
The Court of Appeals has also held that even in the absence of an “exception,” not all information communicated between a physician and patient, or derived from their interaction, is covered by the privilege, including in most circumstances, as the AG points out, the identity of the patients and the dates of treatment. (See Matter of Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984, 69 NY2d at 241, citing Matter of Grand Jury Investigation of Onondaga County, 59 NY2d at 134-135; Lorde v Guardian Life Ins. Co. of Am., 252 App Div 646 [1937].) In addition, “facts which are ‘plain to the observation of anyone without expert or professional knowledge’ are not within the privilege” (Grand Jury Investigation of Onondaga County at 134, quoting Klein v Prudential Ins. Co. of Am., 221 NY 449, 453 [1917]), nor is information “deal[ing] with a non-medical matter, such as the details of an accident which are entirely unrelated to diagnosis or treatment” (Prince, Richardson on Evidence § 5-308, at 253 [Farrell 11th ed], citing Green v Metropolitan St. Ry. Co., 171 NY 201 [1902]). Another limitation precludes the physician or other medical provider from asserting the privilege “to protect himself with respect to a crime committed against the patient” (Matter of Grand Jury Investigation of Onondaga County, 59 NY2d at 135; see also People v Bhatt, 160 Misc 2d at 976, citing Matter of Grand Jury Proceedings [Doe], 56 NY2d 348 [1982], supra), but not from asserting the privilege on behalf of a patient suspected of or charged with a crime. (See Grand Jury Investigation of Onondaga County, 59 NY2d at 135, citing, inter alia, People v Eckert, 2 NY2d 126 [1956].) As the petitioners assert and the AG concedes (supra), there is no “public interest” exception to the privilege under CPLR 4504, nor any exception for grand jury proceedings or criminal investigations generally.
Nevertheless, the grand jury has been endowed with wide latitude in the exercise of its powers to inquire into possible criminal activity (see, e.g., Matter of Grand Jury Proceedings [Doe], 56 NY2d at 352), including the right to subpoena records and other materials without first establishing probable cause, as is required for a search warrant. (See, e.g., Matter of Nassau County Grand Jury Subpoena Duces Tecum v Spitzer, 1 Misc 3d 902[A], 2003 NY Slip Op 51469[U] [NY County Ct 2003].) As the AG points out (supra), a grand jury subpoena duces tecum *194 enjoys a presumption of validity, and the party challenging its validity on the ground that the subpoenaed materials are protected by the physician-patient privilege has the burden of establishing that a physician-patient relationship existed, and that the subpoenaed information was obtained during the course of treatment and was necessary for diagnosis and treatment.
In response to the AG’s claim that the petitioners had not met this burden, the petitioners submitted five sample “consultation reports” from the subpoenaed patient files, from which the names of the patients and physicians (and/or other medical providers) and most references to each patient’s gender, had been redacted. Each document states the date on which a petitioner physician examined the patient; ostensibly records the patient’s complaints about symptoms experienced following an auto accident; and summarizes the results of the physician’s exam (including any tests performed), the physician’s diagnosis, and the physician’s recommendations for the patient’s treatment and further evaluation. The reports also include a small amount of personal information about each patient and the patient’s preaccident medical history (if any).[8] In each report, the examining physician opines that the patient’s symptoms were caused by injuries sustained in the auto accident, although the reports include scant information about the accidents themselves.[9] Leaving aside the issue of an “exception” for the moment, this court finds that the information about the patients’ symptoms and medical histories, the tests performed, and the physicians’ findings, diagnoses, recommended treatments and further evaluation facially meet the definition of privileged under CPLR 4504, but that the names of the patients and physicians/medical providers, the patient’s gender, and the appointment dates do not.
*195 However, the petitioners do not limit their claim of privilege to particular information contained in the sample documents, nor to the sample documents in their entirety. Although they acknowledge that the patients’ names and dates of treatment may not be privileged, they assert that “even a cursory examination [of the sample documents] demonstrates that the subpoenaed patient files contain privileged information,” and that “the same is true of the subpoenaed appointment books, calendars, sign-in sheets and insurance claim records.” As such, the petitioners have fallen far short of meeting the burden to establish that the subpoenaed documents, other than the sample documents, contain information which might qualify as privileged. Moreover, the petitioners appear to misinterpret the holding in Matter of Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984 (supra), upon which they rely in claiming that reviewing the samples “obviates the necessity” of examining the other subpoenaed records “to determine whether there is any particularized need for production of the privileged parts thereof.”
Matter of Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984 tested the physician-patient privilege against grand jury subpoenas issued in a fraud investigation where an “exception” had already been deemed to apply (i.e., in a Medicaid investigation). The Court of Appeals ruled that the only subpoenaed materials which need not be disclosed are those which are both privileged and not necessary to the investigation. The Court clarified that records which are privileged but “obviously necessary” for investigating the validity of a claim, such as those documenting the “diagnosis and the nature and extent of treatment” should be “routinely disclosed,” and that judicial intervention is warranted only when a subpoenaed record contains “highly sensitive matter having no apparent relevance to the . . . investigation.” (69 NY2d at 241.) The Court placed the burden on the party asserting the privilege to identity any such record, and held that the burden to explain such record’s relevance to the investigation would shift to the investigator only if the court were to agree that an explanation was warranted. {See id.) The Court then remitted the matter to give the records custodian the opportunity to demonstrate whether any particular record met such criteria. (See id. at 242.)
This court is persuaded that the privileged information in the sample documents in the case at bar, i.e., that pertain to patient “diagnosis and the nature and extent of treatment,” is as “obvi *196 ously necessary” to investigating the validity of no-fault claims as the appellate courts have found such information essential to investigating the validity of Medicaid/Medicare claims. This court is not persuaded that the differences between Medicaid/ Medicare and no-fault insurance, while no doubt manifold, are significant in the context of determining whether they, as statutorily-mandated programs intended to benefit the public, have been converted into slush funds by thieves fronting as physicians; neither the fact that government regulatory provisions are greater in Medicaid/Medicare than in no-fault, nor the fact that Medicaid/Medicare claims are paid with government funds (deriving from taxpayers), while no-fault claims are paid with insurance company funds (deriving from motorists), is of much moment. This court agrees with the AG that because the public is the ultimate victim of fraud in both, it is equally in the public interest to combat fraud in both.
Medical providers and patients who conspire to make fraudulent claims for no-fault insurance payments subvert the State’s public purpose in enacting both the no-fault insurance program and the physician-patient privilege; a patient who is not a coconspirator is individually victimized — and potentially vulnerable to physical harm, to the extent he or she receives a bogus diagnosis and/or is subjected to medically inappropriate treatment. This court finds that a medical provider should not be entitled to invoke the statutory privilege to prevent an investigation of fraud under either scenario.
This court is mindful of patients’ expectations that information in their medical records will not be publicly disclosed. However, as the AG points out, grand jury proceedings are secret; no grand juror or other person authorized to assist the grand jury in conducting its investigation may, without a court order, disclose the nature or substance of any grand jury evidence. (See CPL 190.25 [4] [a].) In order to afford the patients additional protection, this court will follow the procedure outlined in Matter of Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984 (supra), and offer the petitioners the opportunity to identify any highly sensitive patient information contained in the subpoenaed documents, which is both privileged and not relevant to the investigation. If this court agrees that any such information is highly sensitive and privileged, and that its relevance is questionable, the burden will be on the AG to explain its relevance.
In closing, this court would underscore that “[t]he physician-patient privilege is statutory and is, therefore, to be construed *197 in accordance with its purpose — to encourage full disclosure by the patient so that he can secure appropriate treatment from the physician” (Matter of Grand Jury Investigation of Onondaga County, 59 NY2d at 134 [internal quotation marks omitted]). The petitioners “will not be permitted to avail [themselves] of the physician-patient privilege, which was created for a noble reason, as a cloak to thwart a legitimate inquiry” (Matter of Camperlengo v Blum, 83 AD2d 661, 662 [1981], affd 56 NY2d 251 [1982]).
Accordingly, the petitioners’ application is denied. The petitioners are ordered to comply with the subject subpoenas duces tecum, by August 13, 2007, except to the extent that by that date they have demonstrated to this court that highly sensitive information contained in a subpoenaed document is both privileged and irrelevant to the investigation.

. Kings County Supreme Court Justice Deborah Dowling granted the AG’s application for the search warrants on November 21, 2006.

. Under Insurance Law § 5102 (d), a “serious injury” is defined as “a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person’s usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.” (Emphasis added.)

. Included in the petitioners’ reply affirmation papers are copies of redacted “sample” patient records, one from each of the five petitioners; this court notes that the letterhead of two (Savona and Meridian) bears the address 401 76th Street, No. 1A, Brooklyn, New York (although the Savona letterhead bears the wrong zip code), the same address as one of the premises subject to the search warrants executed on November 28, 2006. The letterhead of a third petitioner (Milan) does not bear a street address, but does bear a telephone number (718-745-4111) which is the same as that on Meridian’s letterhead.

. The six subpoenas are substantially identical, except to the extent each is addressed to a different petitioner and/or seeks records covering a different period of time: Bergamo, Savona, Meridian and Milan were ordered to produce records for the period January 1, 2006 to “present” (Nov. 28, 2006); Palermo received two subpoenas, one each at two different addresses, one seeking records from December 7, 2000 to present, and the other seeking records from January 1, 2006 to present.

. The petitioners refer to these documents as “initial” consultation reports, but three of the five appear to be prepared by specialists to whom the patients were referred by other physicians. The names of the examining and referring physicians were redacted from the reports.

. In a footnote, the petitioners also suggest that the AG may have violated the federal Health Insurance Portability and Accountability Act (HIPAA), by not giving advance notice to the patients or obtaining a protective order before seeking information protected by patient-doctor confidentiality. The AG correctly replies that under HIPAA, disclosure of such information to a law enforcement official pursuant to a grand jury subpoena is permitted without notice or protective order. (45 CFR 164.512 [f] [1] [ii] [A].)

. It should be noted that the AG made this assertion in reply to the petitioners’ initial papers, i.e., before the petitioners submitted the “sample” documents from the patient files referenced above.

. Each of the five reports includes the patient’s age, and indicates that the patient denied alcohol and drug use and having allergies. In addition, one patient said he/she smoked; one reported having hypertension; two reported having had hernia surgery as children; and one reported a preaccident injury to his/her thumb and neck. Three patients reported having jobs at the time of the accident, one of whom said he/she was unable to return to work after the accident.

. One patient said he was a pedestrian hit by a car while crossing the street; one merely said he/she was a front-seat passenger involved in a motor vehicle accident; three said they were driving: one said his vehicle was struck by another vehicle on the left side; one said his car was struck in the rear; the third simply said he was involved in a motor vehicle accident. The dates of the accidents are included.