OPINION OF THE COURT
Patrick J. McGrath, J.
In this proceeding pursuant to CPLR article 78, petitioner challenges respondent’s decision to deny discretionary release to parole supervision. Respondent has answered and opposed the petition, and petitioner has submitted a reply.
Petitioner is serving a sentence of 25 years to life after his conviction for murder in the second degree. Petitioner and the decedent were involved in a drug-related argument, which turned physical. Petitioner had a knife, and chased the decedent for several blocks before he caught up to him, repeatedly stabbed him, and caused his death. Petitioner fled to Tennessee and was apprehended several weeks later. This represents petitioner’s only New York offense. However, he has three other convictions from Tennessee, including an aggravated assault wherein petitioner repeatedly stabbed another person with a broken beer bottle. Petitioner has been in prison for the instant offense for over 30 years.
On June 5, 2012, petitioner appeared for his third regularly scheduled Board appearance (he had one de novo hearing after his second appearance). The Commissioner noted that the Board was in possession of a Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) risk assessment performed on the petitioner, which ranked him as a “low” risk of future violence, arrest, and absconding. Further, the Commissioner noted that the Board had attempted to obtain petitioner’s sentencing minutes, but that the sentencing court had advised *898 the Board that the transcript could not be located despite the exercise of due diligence. The Commissioner reviewed the facts underlying the instant offense, and petitioner acknowledged his guilt and remorse. He indicated that drug use led him to commit the murder. The Commissioner reviewed his criminal history, which showed three arrests in Tennessee, including an assault and two burglaries. The petitioner claimed that he was incarcerated for each conviction, each for a year or less. The Commissioner discussed his programming and educational achievements, including a GED and an Associate’s degree. He has held various job assignments while incarcerated and was a clerk in the law library at the time of the hearing. Petitioner noted that he had “many hours of dental technology.” He noted that he had a wife, but wanted to reenter society through a halfway house, so as not to burden his family with the regiments of parole. The Commissioner noted that petitioner had a tier III ticket for violent conduct a few weeks prior to the hearing, which resulted in 30 days of keeplock, which indicated that petitioner was not the “aggressor.” Petitioner also received two tier II tickets in the past four years. The Commissioner noted that the Board had reviewed the detailed parole packet submitted by the petitioner and asked if petitioner had anything he wanted to add. Petitioner again emphasized that he was a different person today, and that he realized his need for drug treatment.
The Board denied the application, noting that the instant offense was murder, in which petitioner “argued with the victim and when he left your apartment, you followed and pulled a knife,” that he fled to another state, that his record spans two states and dates back to 1979, and includes “prior prison.” (Emphasis added.) The Board took note of petitioner’s COMPAS assessment, rehabilitative efforts, risks, needs, and “all other required factors.” However, the Board found that petitioner “clearly failed to benefit from prior rehabilitative efforts and has violent propensities.” The Board issued a 24-month hold.
Counsel for the petitioner filed an administrative appeal on August 14, 2012. Petitioner then submitted a supplemental appeal, which was received by the Appeals Unit on August 27, 2012. The petitioner provides proof that petitioner’s same attorney submitted a cover letter with the addendum, which states that it was “intended to be considered in addition to the Brief that I submitted several weeks ago.” The Board’s decision was affirmed, making this proceeding ripe for review.
*899 Respondent first argues petitioner did not exhaust his administrative remedies as to several of the issues raised in the petition because they were not included in his administrative appeal. Respondent notes that 9 NYCRR 8006.2 (e) states that “[o]nce counsel has entered an appearance on behalf of an inmate/violator, the appeals unit will not entertain correspondence from the inmate/violator concerning any aspect of the appeal, unless and until notice is received that counsel has been relieved of the assignment.” However, petitioner argues, and the court agrees, that his attorney adopted the pro se submission as his own.
The petition, reply and memorandum of law argue that the 24-month hold was excessive; that the Board did not offer future guidance; that the Board did not consider petitioner’s sentencing minutes; that the Board violated petitioner’s due process rights; that the decision was predetermined; that factual errors at the hearing require a new hearing; that the Commissioner made off the record prejudicial statements about the petitioner; and finally, that the Board failed to apply the new statutory requirements of Executive Law § 259-c (4).
Parole release decisions are discretionary and, if made pursuant to statutory requirements, are not reviewable. (Matter of De La Cruz v Travis, 10 AD3d 789 [3d Dept 2004]; Matter of Collado v New York State Div. of Parole, 287 AD2d 921 [3d Dept 2001] .) If the Parole Board’s decision is made in accordance with the statutory requirements, the Board’s determination is not subject to judicial review. (Matter of De La Cruz v Travis at 789.) Furthermore, only a “showing of irrationality bordering on impropriety” on the part of the Parole Board has been found to necessitate judicial intervention. (Matter of Silmon v Travis, 95 NY2d 470, 476 [2000], quoting Matter of Russo v New York State Bd. of Parole, 50 NY2d 69, 77 [1980].) In the absence of the above, there is no basis upon which to disturb the discretionary determination made by the Parole Board. (See Matter of Perez v New York State Div. of Parole, 294 AD2d 726 [3d Dept 2002] .) With these principles in mind, the court turns to the merits of petitioner’s case.
With respect to the 24-month hold, the court finds that the Board’s decision is within its discretion and was supported by the record. (Matter of Tatta v State of N.Y., Div. of Parole, 290 AD2d 907 [3d Dept 2002], lv denied 98 NY2d 604 [2002].)
Petitioner’s argument that the Parole Board is required to advise petitioner and/or provide guidance with regard to the *900 programs he should take, or rehabilitative efforts he should engage in to increase his chance for release at a future parole interview, has no merit. (See Executive Law § 259-i [2] [a]; 9 NYCRR 8002.3; Matter of Francis v New York State Div. of Parole, 89 AD3d 1312, 1313 [3d Dept 2011]; Matter of Freeman v New York State Div. of Parole, 21 AD3d 1174 [3d Dept 2005].)
With respect to the sentencing minutes,
“[w]hile the Board is generally required to consider sentencing minutes in determining whether to grant an inmate parole, when those minutes are unavailable, its failure to do so does not mandate a new hearing. Here, the Board stated on the record that it had made diligent efforts to obtain petitioner’s sentencing minutes but was unable to do so . . . Further, while there is no indication that a favorable parole recommendation was made beyond petitioner’s assertion that the sentencing court made a favorable recommendation that he serve only the minimum sentence if he were a model prisoner ... it cannot be said that the Board’s inability to consider the minutes rendered its decision ‘irrational so as to border on impropriety.’ ” (Matter of LaSalle v New York State Div. of Parole, 69 AD3d 1252, 1253 [3d Dept 2010] [citations omitted].)
Petitioner incorrectly states that he has a liberty interest in release to parole. (See Matter of Warren v New York State Div. of Parole, 307 AD2d 493, 493 [3d Dept 2003]; Matter of Vineski v Travis, 244 AD2d 737, 738 [3d Dept 1997], lv denied 91 NY2d 809 [1998].)
There is no evidence in the record that the determination was predetermined.
Petitioner contends that the determination was based on two incorrect pieces of factual information. First, that the Board’s decision incorrectly stated that the incident started at petitioner’s apartment. The court notes that during the hearing, the Commissioner stated that the incident took place at “an apartment.” Petitioner also claims that the Board incorrectly noted that he had served time in “prison” prior to the instant offense, when in reality, he had only served three prior jail sentences. However, petitioner was able to “address and resolve any misconception at the hearing.” (Matter of Jones v New York State Div. of Parole, 24 AD3d 827, 829 [3d Dept 2005]; Matter of Rivera v New York State Div. of Parole, 95 AD3d 1586 [3d Dept 2012]; Matter of Sutherland v Evans, 82 AD3d 1428, 1429 [3d *901 Dept 2011].) Further, there is nothing to indicate that the location of the incident or petitioner’s incarceration served as a basis for the decision to deny release. (Matter of Restivo v New York State Bd. of Parole, 70 AD3d 1096, 1097 [3d Dept 2010]; Matter of Williams v Travis, 11 AD3d 788, 790 [3d Dept 2004], lv dismissed 4 NY3d 813 [2005].)
Petitioner refers to off the record comments, however, there is no evidence in the record to establish that the Commissioner was biased or that the determination flowed from such bias. In addition, petitioner failed to raise a timely objection during the hearing, and has thus failed to preserve the issue for review. (See Matter of Raqiyb v Fischer, 2011 NY Slip Op 31110[U] [Sup Ct, Albany County 2011].)
Finally, the petitioner brings a two pronged attack with respect to the amended Executive Law § 259-c (4). First, petitioner claims that his case is “very similar” to Supreme Court’s recent decision in Matter of Morris v New York State Dept. of Corr. & Community Supervision (40 Misc 3d 226 [Sup Ct, Columbia County 2013]), and puts forth the argument made in Morris that the new law requires that written procedures be published, which has not occurred, and therefore, the parole decision is in violation of lawful procedure. Petitioner also argues that the determination was arbitrary and capricious because the Board failed to apply “the new factors set forth in Executive Law 259-c” which require a “future focused risk assessment analysis” rather than “past focused rhetoric.” He states that his COMPAS predicted that he constituted a low risk to reoffend, be arrested again, and to abscond, which is inconsistent with the Board’s determination that there is a reasonable probability that petitioner will not live and remain at liberty again without violating the law.
Prior to the 2011 amendment, Executive Law § 259-c (4) required the establishment of “written guidelines” for use in making parole determinations. Respondent adopted 9 NYCRR 8001.3 (a), including a grid setting forth sentence guidelines. The guidelines explicitly stated that the time ranges in the grid “are merely guidelines [and] [m]itigating or aggravating factors may result in decisions above or below the guidelines.” (Matter of Lue-Shing v Travis, 12 AD3d 802, 803-804 [3d Dept 2004].) The court in Morris reiterated case law that found that the guidelines adopted under the pre-2011 statute were not “rules” and that their validity was not dependent upon filing with the Secretary of State. (Matter of Lue-Shing v Travis at 804, citing Matter of Alca Indus. v Delaney, 92 NY2d 775, 778-779 [1999].)
*902 The 2011 amendment of Executive Law § 259-c (4) mandated the establishment of “written procedures” which, inter alia, “shall incorporate risk and needs principles to measure the rehabilitation of persons appearing before the board” and “the likelihood of success of such persons upon release.” The only written procedure issued by the Department of Corrections and Community Supervision was an October 5, 2011, memo from Board of Parole Chairwoman Andrea W. Evans. The memo specifically references the amendment to Executive Law § 259-c (4). The memo indicates that the Department is developing a Transaction Accountability Plan (TAP). The TAP instrument incorporates risk and needs principles and will provide a meaningful measurement of an inmate’s rehabilitation. It directs that the TAP instrument will replace the inmate status report that was utilized in the past when assessing the appropriateness of an inmate’s release to parole supervision. It mentions the training that the Board members received concerning the TAP instrument. If there is no TAP instrument for a specific inmate then the Board should continue to utilize the inmate status report. The memo further provided that “it is also important to note that the Board was afforded training in September 2011 in the usage of the COMPAS risk and needs assessment tool to understand the interplay between that instrument and the TAP instrument, as well as understanding what each of the risk levels mean.” The memo also indicates that “the standard for assessing the appropriateness for release, as well as the statutory criteria you must consider has not changed through the aforementioned legislation.” It goes on to specifically list all the criteria in Executive Law § 259-i (2) (c) (A).
Respondent argues that this memo serves as the written procedures of the Board pursuant to the amended version of Executive Law § 259-c (4) and is in full compliance with all statutory mandates. Respondent argues that
“although the amendments to Executive Law § 259-(c) (4) made the incorporation of risk and need principles a mandatory part of the procedures to be used in making parole decision, the board did not interpret this language as requiring amendments to the regulations promulgated under the prior version of this statutory scheme as the existing regulations already expressly incorporated risk and needs principles as a required consideration.”
Similar arguments were presented to the court in Morris. Even though the amendment to the statute indicated that the *903 written procedures were to “assist members of the state board of parole in determining which inmates may be released to parole supervision” (§ 259-c [4] [emphasis added]), the court in Morris interpreted the amendment to be “a fixed, general principle to be applied by an administrative agency.” (Matter of Morris v New York State Dept. of Corr & Community Supervision, 40 Misc 3d at 230, citing Matter of New York City Tr. Auth. v New York State Dept. of Labor, 88 NY2d 225, 229 [1996].) The court found “[t]he adopted procedures must be consistent with enabling legislation and as an exercise of rulemaking, the ‘procedures’ must be promulgated and filed with the Secretary of State. (See State Administrative Procedure Act § 102 [2] [a] [i]; Executive Law § 259-c [11]).” (Matter of Morris v New York State Dept. of Corr. & Community Supervision, 40 Misc 3d at 231 n 4.)
Where a fixed general principle is applied by an administrative agency without regard to other facts and circumstances relevant to the underlying regulatory scheme, the agency can be said to have invoked its quasi-legislative, rule-making authority and becomes obligated to file the rule or regulation with the Secretary of State. (Matter of Callanan Indus. v White, 118 AD2d 167 [3d Dept 1986]; Matter of Connell v Regan, 114 AD2d 273, 275 [3d Dept 1986]; see also Matter of Roman Catholic Diocese of Albany v New York State Dept. of Health, 66 NY2d 948, 951 [1985].) New York Constitution, article 1VJ § 8 and Executive Law § 102 establish that no rule or regulation of a state department or board is effective unless it is first filed with the Secretary of State. State Administrative Procedure Act §§ 202 and 203 enumerate the rigorous rule-making procedures which administrative agencies must follow to adopt and enforce rules.
Morris cites Matter of New York City Tr. Auth. v New York State Dept. of Labor, wherein the Court of Appeals held that the Department of Labor penalty guidelines that capped the maximum amount of daily penalties for safety violations were not fixed, general principles to be applied without regard to other facts and circumstances and therefore were not considered rules requiring filing with the Secretary of State and publishing in the State Register. In so holding, the Court indicated
“although the guidelines specify numerical formulas for calculating the ultimate amount of the penalty, they do not establish a rigid, numerical policy invariably applied across-the-board to all claimants without regard to individualized circumstances or *904 mitigating factors. Rather, they encompass both fixed and variable factors unique to a facility to be considered ... on a case-by-case analysis.” (88 NY2d at 229-230 [internal quotations marks and citation omitted].)
The Court stressed that the penalty guidelines do not dictate the result since the ultimate amount of the penalty is dependent on the inspectors’ “independent exercise of their professional judgment.” (Id. at 230.)
In 2003, the Court of Appeals again dealt with the issue of the filing requirement of a rule with the state department in Matter of Medical Socy. of State of N.Y. v Serio (100 NY2d 854 [2003]). The Superintendent of Insurance directed that insurers establish objective standards for reviewing late no-fault claims. The Court held that this was not a rule requiring filing with the Secretary of State. The Court indicated that
“[s]ince the standards encompass case-specific mitigating factors and vest the decisionmakers with significant discretion with which to independently exercise their professional judgment, the standards constitute not ‘rules’ but guidelines. ‘Choosing to take an action . . . based on individual circumstances is significantly different from implementing a standard or procedure that directs what action should be taken regardless of individual circumstances.’ ” (Id. at 868-869, quoting Matter of Alca Indus. v Delaney, 92 NY2d 775, 778 [1999].)
Other cases, wherein discretion is utilized and cases are judged based on individual characteristics, yield the same results: Matter of Taylor v New York State Dept. of Correctional Servs. (248 AD2d 799, 799-800 [3d Dept 1998] [Directive No. 2020, which provides the Department with the right to prohibit an employee from carrying a weapon off duty when it determines, inter alia, that “the employee’s mental or emotional condition is such that his or her possession of a firearm represents a threat to the safety of (the employee), the facility or the community ... is clearly not a rule since its application depends upon respondent’s assessment of individualized circumstances which in this instance was petitioner’s mental or emotional condition”]); Matter of Pallette Stone Corp. v State of N.Y. Off. of Gen. Servs. (245 AD2d 756, 758 [3d Dept 1997] [Office of General Services standards applicable to multiple awards contracts “allow for considerable discretion, namely ‘in the best interests of the state’ and ‘the most practical and economical alterna *905 tive.’ Moreover, the group specifications themselves allowed for discretion in that OGS may or may not grant the reduction. Accordingly, we conclude that no rule had to be formally promulgated under the State Administrative Procedure Act” (citation omitted)]); Matter of Guptill Holding Corp. v Williams (140 AD2d 12, 18 [3d Dept 1988] [Department of Environmental Conservation Life of Mine Review Policy “merely requires DEC to consider in the permit process the long-term environmental effects of a mining project throughout its planned productive life(;) . . . (policy did) not dictate the result of that review, either in terms of whether an environmental impact statement will be required or whether a permit will be issued. As such, the policy is not ‘a fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers’ and, hence, need not have been filed as a rule or regulation” (citation omitted)]).
In contrast, courts have determined that agencies were involved in rulemaking when their policies dictated the outcome and mandated a certain result without discretion: Matter of Schwartfigure v Hartnett (83 NY2d 296, 301-302 [1994] [Department of Labor’s 50% set-off policy for nonwillful overpayments “is a rigid, numerical policy invariably applied across-the-board to all claimants without regard to individualized circumstances or mitigating factors, and as such falls plainly within the definition of a ‘rule’ for State Administrative Procedure Act purposes”]); Matter of Homestead Funding Corp. v State of N.Y. Banking Dept. (95 AD3d 1410, 1413 [3d Dept 2012] [Banking Department created a rule when it implemented its new policy of including secondary market income and income from servicing activities as gross income for purposes of calculating a mortgage bank’s annual general assessment; by redefining income, the Department created an “expansive definition of income, required all mortgage banks to annually report their income based upon that definition, and rigidly applied the definition across-the-board to calculate annual general assessments for all mortgage banks”]); Matter of HD Seros., LLC v New York State Comptroller (51 AD3d 1236 [3d Dept 2008] [State Office of Unclaimed Funds’ policy that any claimants’ signatures on finder’s agreements be notarized was a nondiscretionary and rigid policy applied across-the-board without regard to individualized circumstances or mitigating factors]).
In the instant case, there is no indication that the change in the statute required respondent to adopt a fixed guideline or *906 policy which will determine the outcome of cases before the Parole Board without regard to other facts and circumstances relevant to the underlying regulatory scheme. In fact, Executive Law § 259-i (2) (c) was amended to list all of the factors the Board is still required to consider in making parole release determinations within the same provision. That statute states that
“[d]iscretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law. In making the parole release decision, the procedures adopted pursuant to subdivision four of section two hundred fifty-nine-c of this article shall require that the following be considered: (i) the institutional record including program goals and accomplishments, academic achievements, vocational education, training or work assignments, therapy and interactions with staff and inmates; (ii) performance, if any, as a participant in a temporary release program; (iii) release plans including community resources, employment, education and training and support services available to the inmate; (iv) any deportation order issued by the federal government against the inmate while in the custody of the department and any recommendation regarding deportation made by the commissioner of the department pursuant to section one hundred forty-seven of the correction law; (v) any statement made to the board by the crime victim or the victim’s representative, where the crime victim is deceased or is mentally or physically incapacitated; (vi) the length of the determinate sentence to which the inmate would be subject had he or she received a sentence pursuant to section 70.70 or section 70.71 of the penal law for a felony defined in article two hundred twenty or article two hundred twenty-one of the penal law; (vii) the seriousness of the offense with due consideration to the type of sentence, length of sentence and recommendations of the sentencing court, the *907 district attorney, the attorney for the inmate, the presentence probation report as well as consideration of any mitigating and aggravating factors, and activities following arrest prior to confinement; and (viii) prior criminal record, including the nature and pattern of offenses, adjustment to any previous probation or parole supervision and institutional confinement.” (§ 259-i [2] [c] [A] [emphasis added].)
The revision to Executive Law § 259-i (2) (c) (A) specifically incorporates the amended Executive Law § 259-c (4), as it states that “the procedures adopted pursuant to subdivision four of section two hundred fifty-nine-c of this article shall require” consideration of the above eight factors. It is clear that the two sections of the Executive Law (§§ 259-i [2] [c] [A]; 259-c [4]) are meant to be read together.
Additionally, consideration of all of the above factors will yield substantially different results in every parole determination. The Parole Board must still conduct a factual review of each applicant’s case, but now, that review must include an instrument which measures rehabilitation and the likelihood of success on parole. If the written procedures referenced in Executive Law § 259-c (4) were determinative of whether an inmate could obtain release to parole, there would be no need to consider any of the eight factors listed in Executive Law § 259-i (2) (c), and the entirety of this portion of the statute would be rendered meaningless.
In Morris, the court held that “the amended statute required that respondent develop written procedures that implement risk and needs principles, determine the likelihood of an inmate’s success upon release, and adopt those procedures as an exercise of its rule-making power.” (40 Misc 3d at 230.) Further, “the amendment requires respondents to ‘establish written procedures,’ i.e., enumerate the materials the Board would use to determine an inmate’s likelihood of success upon release.” (Id.) This court agrees that the Department must develop these procedures, enumerate them, and apply them across the board. However, as the above case law makes clear, uniform application does not end the analysis. In order to be considered a rule, the policy must be outcome determinative; it must remove all discretion and individual consideration and dictate a result without regard to the other facts and circumstances relevant to the underlying regulatory scheme. Morris does not consider the underlying regulatory scheme here, which still requires case by *908 case analysis and is dependent on the Board’s “independent exercise of their professional judgment.” (New York City Tr. Auth. v New York State Dept. of Labor, 88 NY2d at 230.)
Therefore, the failure to file written procedures with the Secretary of State does not render the parole decision in violation of lawful procedure and this court declines to follow the rationale set forth in Morris.
With respect to petitioner’s argument that the decision is arbitrary and capricious based on his COMPAS results, the court agrees with respondent that the Board considered all the required statutory factors, including the COMPAS assessment instrument. As noted above, the procedures adopted by the Department, including the COMPAS, are one of many factors to be considered in making a parole decision. While the amendment now requires the Board to consider a new factor, which is forward looking, the Board still must consider the severity of the offense, criminal history, and institutional adjustment. The amendment does not change the well settled law that the Board is not required to discuss every factor considered, and it need not accord every factor equal weight. (Matter of King v New York State Div. of Parole, 83 NY2d 788, 791 [1994]; Graziano v Evans, 90 AD3d 1367 [3d Dept 2011]; Matter of Santos v Evans, 81 AD3d 1059, 1060 [3d Dept 2011].) In this case, the Board considered the COMPAS, and placed more weight on his violent history, prior incarceration, and his recent tier III violation. Based on the specific circumstances of this case, the court cannot state that doing so was irrational.
The court finds the decision of the Parole Board was not in violation of lawful procedure, irrational, arbitrary or capricious. The petition must therefore be dismissed.