Government Employees Ins. Co. v Mayzenberg (2025 NY Slip Op 06527)

Government Employees Ins. Co. v Mayzenberg

2025 NY Slip Op 06527

Decided on November 24, 2025

Court of Appeals

Rivera, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 24, 2025

No. 83 

[*1]Government Employees Insurance Company, et al., Respondents,
v
Igor Mayzenberg, et al., Appellants, et al., Defendants.

Matthew J. Conroy, for appellants.
Anthony R. Raduazo, for amicus curiae New York State Department of Financial Services.
Barry I. Levy, for respondents.
The American Property Casualty Insurance Association et al., 3K-DME Supplies, Inc. et al., and Coalition Against Insurance Fraud, amici curiae.

RIVERA, J.

The United States Court of Appeals for the Second Circuit has certified the question of whether a regulation promulgated by the Department of Financial Services ("DFS") permits an insurer to deny a healthcare provider's no-fault benefits claim because the
provider allegedly committed professional misconduct by paying for patient referrals. DFS interprets its regulation to allow an insurer to deny a no-fault benefits claim only when a provider fails to fulfill a foundational licensing requirement necessary to perform healthcare services in any instance, and not when an insurer unilaterally determines that a properly-licensed provider has committed professional misconduct, short of effectively abdicating control to an unlicensed party. This interpretation is rational, because it is consistent with the regulation's plain text, the no-fault statutory framework, and the legislative purposes of providing swift compensation to victims of motor vehicle accidents and reducing litigation costs. Therefore, [*2]as to those cases where the alleged professional misconduct does not constitute surrender of control to an unlicensed party, we answer the certified question in the negative.
I.
In 1973, the legislature enacted the Comprehensive Automobile Insurance Reparations Act (L 1973, ch 13). The statute "supplanted common-law tort actions for most victims of automobile accidents with a system of no-fault insurance" (Matter of Medical Socy. of State of N.Y. v Serio, 100 NY2d 854, 860 [2003]). "The primary aims of this new system were to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts and to provide substantial premium savings to New York motorists" (id.). In furtherance of these purposes, the no-fault statute requires that every insurance company provide policyholders who are injured in a motor vehicle accident, regardless of fault, with up to $50,000 in "first party benefits," including necessary healthcare expenses (see Insurance Law §§ 5102 [a] [1], 5102 [b], 5103 [a]). Policyholders generally assign their claims for payment of no-fault benefits to their provider after receiving medical treatment, and the provider in turn seeks reimbursements from the insurer (see 11 NYCRR 65-3.11 ["An insurer shall pay benefits . . . upon assignment by the applicant . . . directly to providers of health care services"]). An insurer must promptly pay no-fault benefits (see Insurance Law § 5106 [a]), but it may request from the provider "all items necessary to verify" a claim (11 NYCRR 65-3.5 [c]). After an insurer receives proof of a claim, it must pay no-fault benefits or deny the claim within 30 days (Insurance Law § 5106 [a]; 11 NYCRR 65-3.8 [a] [1]). A no-fault benefits claim is considered "overdue" if an insurer does not pay it within the 30-day deadline (Insurance Law § 5106 [a]). An insurer may be liable for statutory interest on an overdue payment and reasonable attorney's fees for services necessary to secure payment of an overdue claim (id.).
DFS administers the no-fault statute and promulgates regulations pursuant to its statutory authority (see Ostrer v Schenck, 41 NY2d 782, 785-786 [1977]; Insurance Law § 301). In 2001, the Insurance Department—the predecessor agency to DFS—revised its regulations to address increasing reports of no-fault insurance fraud (see 11 NYCRR 65-3.16; see also Serio, 100 NY2d at 860-861). According to the Insurance Department, the most common form of no-fault insurance fraud was perpetrated by "medical mills," which were "corrupt medical clinics" that generated fraudulent bills based on feigned claims of automobile accident injuries (Serio, 100 NY2d at 861). To combat this fraud, the Insurance Department promulgated the regulatory provision at issue here, 11 NYCRR 65-3.16 (a) (12), which states that "[a] provider of health care services is not eligible for reimbursement under [the no-fault statute] if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed."
Plaintiffs Government Employees Insurance Company and its three affiliates (collectively, "GEICO") filed a federal action in the Eastern District of New York against several defendants: Igor Mayzenberg, a New York-licensed acupuncturist; three of his professional service corporations; and two individuals, Igor Dovman and Tamilla Dovman, who were not licensed acupuncturists. GEICO sought, among other relief, a declaratory judgment that one of Mayzenberg's professional service corporations, Mingmen Acupuncture, P.C., was not entitled to reimbursement for pending no-fault benefits claims for services it provided over several years. Relying on 11 NYCRR 65-3.16 (a) (12), GEICO asserted that defendants had engaged in a "kickback" scheme, wherein Mayzenberg paid the Dovmans and some of their companies for patient referrals to Mingmen in violation of professional conduct standards set forth in Education Law § 6530 (18) and a corresponding regulation, 8 NYCRR 29.1 (b) (3). Under Education Law § 6530 (18), "[d]irectly or indirectly offering [and] giving . . . any fee . . . to . . . a third party for the referral of a patient or in connection with the performance of professional services" is professional misconduct. GEICO claimed that the kickback scheme rendered Mingmen ineligible for reimbursement of its pending no-fault benefits claims under 11 NYCRR 65-3.16 (a) (12).
The parties cross-moved for summary judgment. The District Court concluded that there was no genuine dispute of fact that Mayzenberg "engaged in a scheme to defraud GEICO using unlawful fee-splitting, kickback, and referral arrangements with unlicensed persons in violation of New York law" (2022 WL 5173745 at *5 [ED NY, Aug. 24, 2022, No. 17-cv-2802]). The District Court also determined that engaging in this patient referral payment scheme rendered Mingmen ineligible for reimbursement of its pending no-fault benefits claims under 11 NYCRR 65-3.16 (a) (12) (id.). Accordingly, the District Court granted GEICO summary judgment and entered a declaratory judgment absolving GEICO from reimbursing Mingmen for any outstanding no-fault benefits claims (id. at *13).[FN1]
On appeal, the Second Circuit agreed that the undisputed facts, viewed in the light most favorable to Mayzenberg and his professional service corporations, established that they paid referral fees to the Dovmans (121 F4th 404, 408 [2d Cir 2024]). However, the Second Circuit concluded that it was unclear "whether that ethical violation renders Mingmen ineligible to receive payments for no-fault benefits" (id.). The court looked to our prior decisions addressing the scope of 11 NYCRR 65-3.16 (a) (12)—State Farm Mut. Auto. Ins. Co. v Mallela (4 NY3d 313 [2005]) and Andrew Carothers, M.D., P.C. v Progressive Ins. Co. (33 NY3d 389, 406 [2019])—and concluded that they did not resolve whether the regulation "can reach beyond 'licensing and incorporation statutes' to professional misconduct that could implicate a provider's licensure" (id. at 417). As the Second Circuit could not predict how we would resolve this novel issue of New York law, it certified the following question:
"If an insurer determines a healthcare provider has improperly paid others for patient referrals, in violation of [Education Law § 6350 (18)] and [8 NYCRR 29.1 (b) (3)], can the insurer deny payment for no-fault benefits on the ground that the provider 'fail[ed] to meet' a 'necessary' State or local licensing requirement under [11 NYCRR 65-3.16 (a) (12)]?" (id. at 415, 422).
We accepted the certified question (42 NY3d 1044 [2024]), and now answer that an insurer may not deny a provider's claim for reimbursement based on alleged professional misconduct that falls short of ceding control of a professional services corporation to an unlicensed party.
II.
A.
DFS asserts that it has long interpreted 11 NYCRR 65-3.16 (a) (12) as only encompassing pre-licensing requirements, and not standards to maintain licensure. DFS explains that State regulators have sole discretion to determine whether a provider has committed professional misconduct and, if they have, whether there should be licensing consequences that affect their ability to collect no-fault reimbursements. Only after a State regulator has determined that a provider committed professional misconduct, and it has suspended, annulled, or revoked their license, may an insurer deny the provider reimbursement of a no-fault benefits claim under 11 NYCRR 65-3.16 (a) (12). Additionally, DFS states that its interpretation of 11 NYCRR 65-3.16 (a) (12) does not preclude plaintiffs from arguing in this action that Mayzenberg's kickback scheme was so extensive as to essentially cede improper control of Mingmen to unlicensed individuals, in violation of licensing requirements. Plaintiffs argue that 11 NYCRR 65-3.16 (a) (12) allows an insurer to deny reimbursement based on its unilateral determination that a provider allegedly committed professional misconduct.
B.
DFS's interpretation of 11 NYCRR 65-3.16 (a) (12) is rational. First, interpreting the regulation to exclude professional misconduct fully comports with the regulatory text. Although 11 NYCRR 65-3.16 (a) (12) does not expressly define the term "licensing requirement," the Court has generally understood the phrase as encompassing prerequisites to obtain a license and lawfully operate in a particular regulated area (see e.g. Matter of Belmonte v Snashall, 2 NY3d 560, 564 [2004] [referring to the prerequisites to perform independent medical examinations as "licensing requirements"]), and that reading is consistent with the term's ordinary legal usage (see Black's Law Dictionary [12th ed 2024], licensing ["A governmental body's process of issuing a license"]). The legislature adopted this understanding in the Education Law, which lists requirements for a professional license as those that "shall [be] fulfill[ed]" "[t]o qualify for a license" in various professional fields, including acupuncture (see Education Law § 8214 [requirements for acupuncturists]; see also Education Law § 6524 [requirements for physicians]; Education Law § 6501 [titled "Admission to a profession [licensing]"). While the Education Law enumerates rules of professional conduct, it does not describe them as licensing requirements (see id. § 6530).
The regulation also states that a provider is ineligible for reimbursement if it "fails to meet any applicable . . . licensing requirement necessary" to perform professional services (11 NYCRR 65-3.16 [a] [12]). This language predicates reimbursement on a provider's compliance with the legal mandates for providing professional services in the first instance. In other words, the regulation renders ineligible providers who have not fulfilled the prerequisites to obtain a valid license, which legally prevents them from providing services. In contrast to providers who violate a foundational licensing requirement, those who commit professional misconduct do not necessarily lose their licenses. Under the Education Law, the Board of Regents is responsible for imposing penalties for professional misconduct, which include discipline short of license suspension, revocation, or annulment (see Education Law § 6511). Adhering to professional conduct standards therefore cannot be a "necessary" licensing requirement for the purposes of the regulation, and DFS's interpretation aligns with this language.
Second, DFS's interpretation of the regulation is consistent with New York's licensing regimes, which grant the Board of Regents "considerable discretion concerning matters of professional misconduct, including the revocation and restoration of . . . licenses" (Matter of Nehorayoff v Mills, 95 NY2d 671, 674 [2001]). Indeed, the Education Law vests the Board of Regents with "final authority" concerning matters of professional discipline (David v Biondo, 92 NY2d 318 [1998]). Under the Education Law, the Board of Regents is responsible for imposing penalties, which include mandatory training, fines, or suspension, revocation or annulment of a license (see Education Law § 6511). A licensed professional may challenge a determination of the Board of Regents in an article 78 proceeding, in which judicial review is limited to whether the agency's determination "was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]; see also Education Law § 6510 [5]; Matter of Nehorayoff v Mills, 95 NY2d 671 [2001] ["As long as the Board (of Regents)'s determination is supported by a rational basis, and is neither arbitrary nor capricious, it will not be disturbed"]). DFS's interpretation ensures the primacy and integrity of the Board of Regents's regulatory oversight. Allowing insurers to deny no-fault benefits reimbursements based on their unilateral determination that a provider has engaged in professional misconduct would displace the Board of Regents as the principal enforcer of professional discipline, undermining this carefully constructed statutory regime.
Third, DFS's interpretation of the regulation furthers the no-fault statute's goals of ensuring prompt payments to accident victims and reducing litigation (see Serio, 100 NY2d at 860). If the regulation encompassed professional misconduct, then an insurer could, as GEICO did here, deny reimbursement of no-fault benefits claims based on unproven allegations of such misconduct, even if those allegations may never result in the provider losing their license. GEICO's proposed interpretation would have the perverse effect of delaying payments and incentivizing litigation, based on an insurer's unilateral determination that a provider violated any one of the fifty distinct categories of professional misconduct in Education Law § 6530, including relatively minor departures from professional standards (see e.g. Education Law § 6530 [*3][designating as professional misconduct "(f)ailing to complete forms or reports required for the reimbursement of a patient by a third party" and "(f)ailing to wear an identifying badge, which shall be conspicuously displayed and legible"]). That outcome is contrary to the Court's admonishment that mere technical violations of licensing laws are insufficient to justify an insurer's delay in payment of claims (see Mallela, 4 NY3d at 322; Carothers, 33 NY3d at 406). Moreover, GEICO's proposed interpretation ignores the compromise reflected in the no-fault law of "prompt payment for basic economic loss to injured persons regardless of fault, in exchange for a limitation on litigation to cases involving serious injury" (Pommells v Perez, 4 NY3d 566, 571 [2005]), which furthers the "obvious goal[ ]" of "keep[ing] minor personal injury cases out of court" (Licari v Elliott, 57 NY2d 230, 236 [1982]).
The Court's holdings in Mallela and Carothers do not foreclose DFS's interpretation of 11 NYCRR 65-3.16 (a) (12). In Mallela, the Court concluded that under the regulation, an insurer may deny no-fault reimbursement claims for medical services provided by a professional services corporation that was fraudulently incorporated (4 NY3d at 319). The insurer in Mallela alleged that unlicensed individuals paid licensed physicians to include their names in paperwork filed with the State to incorporate professional services corporations, while the unlicensed individuals actually operated the businesses upon incorporation (id.). The Court explained that "the applicable state licensing requirements . . . prohibit nonphysicians from owning or controlling medical service corporations" (id. at 320-321).
In Carothers, the insurers alleged that although a physician initially obtained a proper license for his professional services corporation, he ceded control to unlicensed individuals after incorporation (33 NY3d at 397). The Court clarified that an insurer may deny no-fault reimbursement claims from providers that engage in the "willful and material failure to abide by licensing and incorporation statutes," even without a finding of fraud (id. at 393-394 [internal quotation marks omitted]). The Court further explained that when a professional services corporation violates a foundational statutory requirement for licensure, that violation voids the corporation's license regardless of when the violation is discovered or committed. By contrast, Mayzenberg's alleged professional misconduct would not affect his license until State regulators choose, in their discretion, to impose such a penalty.
The dissent's unqualified interpretation of 11 NYCRR 65-3.16 (a) (12) provides no limiting principle that cabins its reasoning to kickbacks, excluding other forms of professional misconduct that an insurer may similarly argue are "grave and willful" (dissenting op at 3). Notably, the dissent's position on what constitutes a kickback scheme in the first place is unclear. It surely cannot be that every violation of Education Law § 6530 (18), including paying a small fee in exchange for a single referral for a patient to whom a provider gives medically necessary treatment, is a "kickback scheme." However, the dissent provides no way to determine when a paid referral process transforms into a "kickback scheme" sufficient to justify denying reimbursement. Indeed, under the dissent's flawed interpretation of the regulation, insurers would be incentivized to test the threshold. Moreover, contrary to the dissent's view, an insurer may deny reimbursement on the basis that a provider has failed to fully respond to a verification, potentially incentivizing the insurer to ask for records related to as many professional misconduct standards as possible (see 11 NYCRR 65-3.8 [b] [3]). Even if an insurer may not be wholly confident that it would prevail in litigation, it may leverage a settlement that would ultimately cost it less than wholesale reimbursement.[FN2]
In an effort to bolster its interpretation, the dissent erroneously asserts that DFS "has no prior publicly stated opinion on this exact issue" (see dissenting op at 22). Although the regulation's application to instances of professional misconduct was not at issue in Mallela, the Superintendent of the Insurance [*4]Department noted in an amicus brief that the regulation does not encompass professional misconduct "unless and until the licensing authority actually [takes] . . . disciplinary action. Only at that point would the [provider] be ineligible" (brief for amicus curiae in Mallela at 29). This language is fully consistent with DFS's current interpretation of the regulation and not, as the dissent alleges, a "post-hoc rationalization made for the purpose of litigation" (dissenting op at 22), an already weak claim given that DFS is not a party in this case. Further, the dissent's assertion that we do not defer to agency determinations that are arbitrary and capricious is a misstatement of the law (see id. at 22). The arbitrary and capricious standard applies to agency determinations (see Peckham, 12 NY3d at 431). DFS made no determination here, as it simply interpreted a statute that it is tasked with implementing.
For these reasons, DFS's interpretation of its regulation is rational and entitled to deference (see Andryeyeva v New York Health Care, Inc., 33 NY3d 152, 174 [2019],
quoting Matter of Peckham v Calogero, 12 NY3d 424, 431 [2009] ["As a general rule, 'courts must defer to an administrative agency's rational interpretation of its own regulations in its area of expertise' "]). The dissent's disagreement over whether to defer to DFS's interpretation is misguided, because DFS's interpretation fully aligns with ordinary rules of construction (see supra, 7-10). We therefore answer the certified question in accordance with this interpretation.
III.
Insurers are not without recourse if they conclude that a provider has fraudulently billed for unnecessary or nonexistent services, or has allowed nonphysicians to control a professional services corporation. Indeed, an insurer may deny a claim for reimbursement on the ground that the medical expenses were not necessary (see Insurance Law § 5102 [a] [1]). Thus, it was rational for DFS not to draft 11 NYCRR 65-3.16 (a) (12) to encompass medically unnecessary services when insurers could already deny reimbursement on that basis.
Even where the provider renders medically necessary services, an insurer can seek damages or assert a claim for unjust enrichment (cf. Mallela, 4 NY3d at 322). Moreover, the no-fault statute empowers the State to take swift action in response to alleged professional misconduct. It requires every insurer to report "any patterns of overcharging, excessive treatment or other improper actions by a health provider within [30] days after such insurer has knowledge of such pattern" (Insurance Law § 5108 [c]). If the State believes that a provider has engaged in professional misconduct, it "may temporarily prohibit the provider from demanding or requesting payment for medical services . . . for up to 90 days from the date of the notice of such temporary prohibition" (11 NYCRR 65-5.5 [a]). If the Board of Regents then determines that the provider is guilty of professional misconduct, the State may deauthorize the provider from demanding or receiving no-fault reimbursements (see Insurance Law § 5109 [b] [1]). Here, nothing prevented plaintiffs from speedily reporting to the State their claims that Mayzenberg was paying referral fees.
Finally, as explained above, DFS does not assert that its interpretation of 11 NYCRR 65-3.16 (a) (12) precludes an insurer from arguing that a provider's misconduct effectively ceded control of their professional services corporation to unlicensed individuals, implicating Mallela and Carothers. Plaintiffs have not advanced that argument here, instead only claiming that Mayzenberg was not entitled to reimbursement because he engaged in a kickback scheme. Mayzenberg therefore had no opportunity to dispute that he ceded control of Mingmen to the Dovmans, and the District Court did not address the issue. Given this procedural posture, we do not address the circumstances in which a kickback scheme may constitute the prohibited abdication of control to unlicensed individuals. The dissent takes up this unpreserved question by making conclusions about the degree to which Mayzenberg ceded control of Mingmen, resolving a legal issue that plaintiffs have not raised and is properly left to the federal courts (see dissenting op at 10-11).
GEICO's assertion that the State's efforts to combat fraud in the no-fault insurance system are lacking, if true, is concerning. Indeed, DFS's interpretation of 11 NYCRR 65-3.16 (a) (12) relies in part on its assertion of exclusive State authority to regulate and police the conduct at issue here. However, for the [*5]reasons discussed above, DFS's interpretation of its regulation is rational. The question of how best to combat fraud in the no-fault insurance system implicates policy concerns best left to the legislature and DFS, not the Court (see People v Jones, 26 NY3d 730, 741 [2016] ["These policy determinations are beyond our authority and instead best left for the (L)egislature"] [internal citations omitted]; People v Francis, 30 NY3d 737, 751 [2018] ["The constitutional principle of separation of powers . . . requires that the Legislature make the critical policy decisions"] [internal quotation marks omitted]). In any event, GEICO fails to explain how its interpretation—which shifts determinations of professional misconduct from the Board of Regents to insurers and the courts in the first instance, with the attendant risk of engendering conflicting outcomes and uncertainty in disciplinary matters—would more effectively address fraud than the current system does.
IV.
DFS's longstanding interpretation of its own regulation, 11 NYCRR 65-3.16 (a) (12), is consistent with the regulatory text and purpose, the statutory structure of both the no-fault payment and professional licensing regimes, and the legislative purpose of the no-fault law. GEICO's proposed interpretation of the regulation would undermine the carefully crafted statutory framework by empowering insurers to delay and deny no-fault payments, incentivizing interference with the statutory authority of the Board of Regents to determine guilt and adequate punishment for professional misconduct.
Accordingly, the certified question should be answered in accordance with this opinion.

WILSON, Chief Judge (dissenting):

As we held in Mallela and reiterated in Carothers, the integrity of the no-fault system relies on provider control of medical service corporations (see State Farm Mut. Auto. Ins. Co. v Mallela, 4 NY3d 313 [2005]; Andrew Carothers, M.D., P.C. v Progressive
Ins. Co., 33 NY3d 389 [2019]). Whether that provider control is disrupted by a fraudulently incorporated medical enterprise in violation of a licensing prerequisite or, as here, a kickback scheme to split fees with third-party non-providers in violation of a professional misconduct rule, is a distinction without a difference. In those prior cases, the Department of Financial Services (DFS) submitted amicus briefs urging that a broad prohibition of schemes that funnel profits to non-providers was essential to the preservation of the integrity and functioning of the no-fault system. In reliance on DFS's statements in those cases, we explained that the granting of a financial interest to a person or entity that was not a licensed provider was incompatible with the no-fault system, even if all the claims submitted were entirely appropriate. We emphasized that such violations were not harmless technical violations, but important enablers of fraud and abuse that impair a provider's professional responsibility to its patients. Such schemes have the potential to inflate costs of the no-fault system, which are ultimately paid by all policyholders by way of higher premiums.
As the majority notes, the federal district court found that Igor Mayzenberg, through his variously named acupuncture businesses, "engaged in a scheme to defraud GEICO using unlawful fee-splitting, kickback, and referral arrangements with unlicensed persons in violation of New York law" (2022 WL 5173745 at *5 [EDNY, Aug. 24, 2022, No. 17-cv-2802]). Mr. Mayzenberg paid kickbacks to third-party non-providers totaling approximately $390,000 for referring patients. He then charged GEICO nearly $4,900,000 in no-fault benefits for his companies' acupuncture services, which GEICO, understandably, refused to pay. Mr. Mayzenberg's scheme has no functional, practical, or economic difference to the schemes we disapproved—as DFS urged us to do—in Mallela and Carothers. Indeed, giving a non-provider co-ownership in a no-fault provider's business (a concept we disapproved in our prior cases) is not quite as bad as entering into an agreement with a non-provider to pay the non-provider a share of the value of the referrals made by the non-provider: in the latter case, the non-provider has a strong incentive to steer phony claims to the provider, whereas in our former cases, there was not even an allegation of steering. Thus, in our prior cases we held that an insurer could withhold reimbursement to a provider because of the potential for fraud, whereas here the majority, aided by DFS's irrational change in position, denies the insurer the right [*6]to withhold payment where there is a finding—one that we must accept—that the scheme's purpose here was to defraud GEICO. Consistent with our precedent in Mallela and Carothers, and DFS's prior amicus briefs, 11 NYCRR 65-3.16 (a) (12) must be read to capture a narrowly defined class of grave and willful violations of law that disrupt basic precepts of the no-fault reimbursement system. Mr. Mayzenberg's conduct, a kickback scheme in violation of Education Law § 6530 (18) and 8 NYCRR 29.1 (b) (3), falls within that class. Accordingly, I dissent. I.
In 1973, the New York State Legislature enacted the Comprehensive Motor Vehicle Insurance Reparations Act, known colloquially as the no-fault system (see L 1973, ch 13; Insurance Law §§ 5101-5109; 11 NYCRR 65). The purpose of the no-fault system is to displace most of the State's common law tort regime for injuries arising from automobile accidents in the hopes it would "ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts and to provide substantial premium savings to New York motorist" (Matter of Medical Socy. of State v Serio, 100 NY2d 854, 860 [2003]). In the event of a motor vehicle accident, automobile insurers like GEICO must pay up to $50,000 for an accident victim's "basic economic loss", which includes all "necessary expenses incurred for" medical or other professional health services, regardless of the policyholders' fault or negligence in causing the accident (Insurance Law § 5102 [a]). Accident victims typically assign their no-fault benefits to their medical service providers, who thereafter bill the insurer directly for reimbursement (Mallela, 4 NY3d at 319; 11 NYCRR 65-3.11 [a]—[b]). That system guarantees that an accident victim's necessary medical expenses will not be delayed pending determination of fault or coverage.
No-fault reimbursements must be paid by insurers "within a strict, short-leashed contestable period and process designed to avoid prejudice and red-tape dilatory practices", consistent with no-fault's goal of prompt uncontested payments (Presbyt. Hosp. in the City of New York v Maryland Cas. Co., 90 NY2d 274, 285 [1997]). That requirement helps to ensure that providers who have aided accident victims do not suffer cash flow problems or bear the cost of the time value of money while insurers debate whether to pay. However, the no-fault scheme "allows carriers to contest ill-founded, illegitimate and fraudulent claims" (id.). For example, insurers may request additional verification and investigate claims through various avenues, so long as they do so in accordance with the scheme's prompt deadlines (see e.g. 11 NYCRR 65-3.5 [a]—[b]). One ground an insurer can raise to investigate the legitimacy of a claim and potentially deny payment is the medical service provider's eligibility to receive reimbursement. 11 NYCRR 65-3.16 (a) (12) says that "a provider of health care services is not eligible for reimbursement . . . if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such services in New York". Once an insurer receives sufficient evidence of proof of loss, it must pay or deny the no-fault benefit claim within 30-calendar days, or it will owe interest and reasonable attorney's fees (Insurance Law § 5106 [a]; 11 NYCRR 65-3.8 [a] [1]).
Fraud followed the enactment of the no-fault system. From "1992 to 2001, reports of suspected automobile insurance fraud increased by 275%, the bulk of the increase occurring in no-fault insurance fraud" (Matter of Medical Socy. of State, 100 NY2d at 861). By 2000, no-fault fraud accounted for "more than 55% of the 22,247 reports involving all types of insurance fraud" (id.). According to DFS, this fraud was most perpetrated through "medical mills" which would "generate stacks of medical bills for each [patient], detailing treatments and tests that were unnecessary or never performed" (id.). As a result, DFS imposed new no-fault regulations in 2001, including 11 NYCRR 65-3.16 (a) (12), to "ensure that the public receives the benefits of reduced fraud and abuse provided by the proposed regulation at the earliest possible moment and to minimize, to the greatest extent, any disruption and confusion in the handling of no-fault claims" ( NY St Reg, May 9, 2001 at 19).
In Mallela, we addressed whether, in light of 11 NYCRR 65-3.16 (a) (12), insurance carriers may withhold reimbursements for medical services that have been assigned by patients to businesses providing [*7]medical care to accident victims where a nonprofessional held an interest in the business, which violates N.Y. Business Corporation Law §§ 1507, 1508, and Education Law § 6507 (4) (c) (see Mallela, 4 NY3d at 319-321). We held insurers do not have to reimburse providers which are partially owned or controlled by nonprofessionals. Our holding did not conflict with the prompt delivery of medical care to the accident victims, who actually received the services, but instead shifted the cost of the services from the insurer to the provider. We observed that the result was vital to effectuate "our State's prohibition against lay ownership of shares in medical corporations (and the accompanying potential for fraud)" (id. at 321). In our holding we noted that insurers may look beyond the face of licensing documents to identify these "willful and material" failures.
Later, in Carothers, we reiterated our conclusion, stating that "[c]ontrol of medical service corporations by unlicensed individuals leads to higher costs, less effective medical treatment, and mistrust of the no-fault insurance system" (33 NY3d at 404). We further explained that "the common law in New York has long recognized the need to ensure that providers of professional services are not unduly influenced by unlicensed third parties who are free of professional responsibility requirements and may disregard patient care" to focus instead on financial outcomes (id.). In both Mallela and Carothers, we held that splitting no-fault treatment fees with nonphysicians threatened the integrity of the no-fault system and justified an insurers ability to deny reimbursements pursuant to 11 NYCRR 65-3.16 (a) (12) and the policy behind the no-fault system.
II.
Mr. Mayzenberg's arrangement in this case is the same wolf DFS urged us to forbid in Mallela and Carothers, just in a different set of clothes. In 2001, DFS amended 11 NYCRR 65-3.16 (a) (12) to "clarify that a health care provider must be properly licensed to be eligible for reimbursement under no-fault" (NY St Reg, May 9, 2001 at 19). The amended "regulation was intended to address abuses in the No-Fault system as well as fraud" (id.). DFS's Mallela amicus brief reiterated that point. DFS (then known as the Superintendent of Insurance) titled a section of its brief "The Superintendent Promulgated Section 65-3.16 (a) (12) to Target Fraud and Abuse" (Brief for Gregory v Serio, the Superintendent of Insurance of the State of New York, amicus curiae, at 16, Mallela, 4 NY3d 313). Within that section, it noted that 11 NYCRR 65-3.16 (a) (12) "was intended to combat No-Fault fraud and abuse perpetrated largely by medical mills, which . . . often are fraudulently formed medical" service corporations (id. at 20). DFS's explanation notes that fraudulently formed medical service corporations are not the only mechanism by which medical mills abuse the no fault system. Rather, the general takeaway from DFS's Mallela amicus brief was that the 2001 amendments, including 11 NYCRR 65-3.16 (a) (12), were intended to combat various forms of no-fault abuse.
In Carothers, DFS's amicus similarly stressed its "critical interest in vindicating the policies underlying [its] regulation" which prevent no-fault abuse and "prioritize quality patient care over profit-seeking" (Brief for New York State DFS, amicus curiae, at 2, Carothers, 33 NY3d 389 [2019]). "By deterring the unlawful structures that enable large-scale fraud, § 65-3.16(a)(12) operates as a tool to thwart prevalent forms of abuse involving bad actors who pay doctors for the use of their licenses to establish corrupt medical clinics and extract massive sums in no-fault insurance reimbursements" (id. at 3). DFS devoted an entire section of its Carothers amicus brief to fee splitting, in which it acknowledged that "the sharing of revenues with unlicensed nonphysicians is no mere technical, harmless violation of law" and that "laws prohibiting professionals from splitting fees are broadly necessary to prevent arrangements that impair the discharge of professional responsibility to clients" (id. at 40). DFS stated that "in the no-fault scheme, improper structures that allocate profits to nonphysicians have proven key facilitators of insidious forms of fraud and abuse" (id.). In sum, DFS argued that "basic logic dictates that eliminating 'arrangements in which someone other than the physician has a financial incentive for increasing the physician's revenues' will 'reduce opportunities for fraud' " (id. at 32). DFS's repeated statements in Carothers leave no doubt that the [*8]evil "broadly necessary" to combat through the denial of reimbursement where "arrangement" split fees with nonprofessionals.
In the instant case, DFS abandons its prior positions, offering instead an unprincipled and wholly illogical position: if a nonprofessional co-owns a no-fault provider, the insurer does not have to reimburse the provider for any services, even legitimate ones, but if a provider wholly owned by professionals instead enters an agreement to give a portion of the revenues from patients referred to a nonprofessional, the insurer may not withhold reimbursement even if the services were unnecessary and, therefore, fraudulent [FN1]. DFS "strongly disagrees" with the district court's interpretation of 11 NYCRR 65-3.16 (a) (12), but does not quarrel with the proposition that the two cause the same harm in the same way [FN2]. Instead of focusing on the underlying purpose of the no-fault system, the specific purpose of 11 NYCRR 65-3.16 (a) (12), or the substance of the positions it articulated in its prior briefs to our Court, DFS contends that allowing insurers to refuse reimbursement in cases such as this would usurp DFS's authority over professional conduct violations (id. at 20).
The federal district court saw through this subterfuge: fee splitting schemes like those at issue here are on all fours with the fraudulently incorporated enterprises that allowed non-provider ownership in Mallela and Carothers. Although kickback schemes take a different form, they are in substance an alternative mechanism by which to transfer a measure of decisionmaking about treatment from licensed medical providers to other persons unauthorized to make or influence such decisions, leading to fraud on the no-fault system and increased premiums for New York motorists.
The difference in form here renders the abuse more egregious and dangerous than those we eschewed in Mallela and Carothers. In Mallela, we held that although "the actual care that patients received was within the scope of the licenses of those who treated the patient", we will not tolerate violations of licensing requirements (4 NY2d at 321). Here, we are not evaluating proper care provided by an entity with a co-owner who was not a medical professional—for which this Court allows insurers to deny reimbursements under 11 NYCRR 65-3.16 (a) (12). Rather, we are evaluating a situation in which a wholly-owned nonmedical entity is choosing patients and directing them to Mr. Mayzenberg's entities in exchange for an allegedly randomly demanded fee, where some of those people did not need his care [FN3]. Mr. Mayzenberg [*9]admits he administered acupuncture to patients as long as they were willing to return, revealing he offered some services that were never medically necessary [FN4]. Mr. Mayzenberg and his entities, who were the only licensed providers, had nothing to do with the initial selection of who would receive treatment: that was in the hands of unlicensed nonprofessional for-profit entities.
The no-fault system is meant to prevent these fraudulent claims in the first instance. The majority's decision instead requires insurers to pay for millions of dollars in fraudulent reimbursements and presents them with only prospective, untried and uncertain solutions. That is hardly consistent with the majority's acknowledgement that a primary aim of the no-fault system is "to provide substantial premium savings to New York motorists" (Matter of Medical Socy. of State, 100 NY2d at 860). DFS's 2013 amendments to its implementing regulations note that fraud in the no-fault system "costs no-fault insurers tens if not hundreds of millions of dollars, which insurers ultimately pass on to New York consumers in the form of higher automobile insurance premiums" and "threaten[] the affordability of health care and the public's health, safety, and welfare" (11 NYCRR 65-5.0). By forcing insurers to front millions of dollars in fraudulent reimbursement in the case of fee splitting, rather than preventing payment consistent with larger purpose of the no-fault scheme, the majority's holding will ensure increased costs to the no-fault system. My interpretation would ensure the opposite result, thereby providing premium savings to New York motorists.
To support its position, the majority argues the term "licensing requirement" in 11 NYCRR 65-3.16 (a) (12) is meant to only include initial statutory prerequisites needed to obtain a license in the first place, and [*10]not those requirements necessary to maintain a license thereafter.[FN5], [FN6] Again, the timing of the fraud (before or after licensing) is a form-over-substance problem. Indeed, in Carothers the violation occurred after the provider properly obtained its license (33 NY3d 389). In other words, there, just as it should here, this Court read the text of 11 NYCRR 65-3.16 (a) (12) to encompass a violation that (i) is necessary to maintain, not merely to obtain, a license and (ii) may, but does not automatically, lead to license revocation. Ultimately, the majority and DFS draw a line that construes 11 NYCRR 65-3.16 (a) (12) to permit certain allegations of funneling profits to non-providers but forbid others. There is no rational basis to separate violations like fee splitting from other "licensing requirements" that duly interfere with provider control of medical service corporations, only semantics.
III.
The majority's primary contention is that to hold 11 NYCRR 65-3.16 (a) (12) encompasses fee splitting violations would "have the perverse effect of delaying payments and incentivizing litigation, based on an insurer's unilateral determination that a provider violated any one of the fifty distinct categories of professional misconduct in Education Law § 6530, including relatively minor departures from professional standards" (majority op at 9). That would not be so, unless the majority adopted a rule to make it so.
First, we have already gone through the balancing act of weighing prompt reimbursement with the prohibition of fraud, and held the former did not get in the way of the latter (see Mallela, 4 NY3d at 321). Second, it is not the patient whose reimbursement is delayed while claims of fraudulent fee splitting are investigated (see Matter of Medical Socy. of State, 100 NY2d at 859 [noting one of "(t)he primary aims of this new system w[as] to ensure prompt compensation for losses incurred by accident victims"] [emphasis added]). Patients typically assign their no-fault claims to their medical provider. As a result, it is the provider that would experience any delays, a worry they must face only if legitimately accused of fraud, given all of the additional limiting principles on insurers articulated below.
In addition, both Mallela and Carothers, and the precise certified question posed in this case, include limiting principles that would allow insurers to delay or deny reimbursement only within a narrowly defined set of circumstances. In Mallela, we held that insurers may delay reimbursement "to pursue investigations solely for good cause", in the effort to identify "willful and material failure[s] to abide by state and local law" that are "tantamount to fraud", but not for mere "technical violations" (4 NY3d at 321-322). Our decision in Mallela rested in part on DFS's interpretation, which stated the no-fault system "does not permit abuse of the truth-seeking opportunity that 11 NYCRR 65-3.16 (a) (12) authorizes" (id. at 322). DFS spent four pages in its Mallela amicus brief on a final subsection, titled "The District Court's Remaining Concerns About Construing Section 11 NYCRR 65-3.16 (a) (12) Broadly are Unfounded" (Brief for the Superintendent of Insurance, amicus curiae, at 28-31, Mallela, 4 NY3d 313). In it, DFS articulated that "allowing an insurer, in certain carefully delineated circumstances and subject to ongoing [DFS] oversight, to look behind a facially valid license to determine whether a provider is lawfully authorized to provide and bill for medical services under New York law creates no slippery slope" (id.). DFS explained that even a broad reading of 11 NYCRR 65-3.16 (a) (12) would not permit technical administrative requirements, such as failure to pay child support or license renewal fees, to have "any bearing on the question [of] whether a provider is 'lawfully' authorized to provide and bill for health care service" (id at 30).
Similarly, DFS had a section in its Carothers amicus which argued "Public Policy Counsels Strongly Against Limiting the Scope of § 65-3.16 (a) (12)" (Brief for DFS, amicus curiae, at 35, Carothers, 33 NY3d 389). In our Carothers decision, we reinforced the "willful and material" misconduct language from Mallela, explaining that although misconduct need not approximate fraud to fall under 11 NYCRR 65-3.16 (a) (12), it must be grave, rather than technical (33 NY3d 389, at 405-406). Thus, neither our Court nor DFS had any problem drawing administrable lines previously.
In its current brief, DFS abandons its previous stance and stresses the slippery slope arguments it heretofore disclaimed. For instance, DFS now asserts that, under GEICO's reading, each of the 50 forms of professional misconduct "presents an opportunity to delay the recovery of no-fault claims" given that there is "no discernable way for an insurer to distinguish a technical violation from a nontechnical violation in the context of professional misconduct" (Brief for DFS, amicus curiae, at 29-31). The inconsistency with its prior position is patent. To allow 11 NYCRR 65-3.16 (a) (12) to encompass fee splitting remains consistent with Mallela and Carothers, which broadly allow for insurers to undertake good cause investigations for fraud, including the ability to look beyond licensing documents, while restricting what level of provider misconduct can justify denial of no-fault reimbursement—that is grave, willful, and material violations of law. It is why, for example, it is easy to distinguish the circumstances of New Way from the circumstances here: paying a billing and collection service is not fee splitting in substance; paying kickbacks for referrals is.
The majority's similar slippery slope contention—that it is hard to determine the line between a single payment for a referral and a kickback scheme, and that said determination of the extent of unnecessary services is hard to determine a priori—applies with equal force to ownership by nonmedical providers. Under our prior decisions in Mallela and Carothers, we have held an insurer may withhold reimbursement to a medical provider that is partially owned by a nonmedical person or entity, yet we have provided no guidance about whether a 50%, 10%, 1% or .001% ownership interest sets the line, nor have we asked for proof that the fractional ownership interest resulted in the provision of unnecessary medical services. Neither we nor DFS found the majority's argument persuasive in Mallela or Carothers, and the 180-degree turnaround adopted here is unprincipled.
All the Second Circuit asks us to decide is:
"If an insurer determines a healthcare provider has improperly paid others for patient referrals, in violation of New York Education Law § 6530(18) and 8 N.Y.C.R.R. § 29.1(b)(3), can the insurer deny payment for no-fault benefits on the ground that the provider "fail[ed] to meet" a "necessary" State or local [*11]licensing requirement under 11 N.Y.C.R.R. § 65-3.16(a)(12)?" (121 F4th 404, 422 [2d Cir 2024], certified question accepted, 42 NY3d 1044 [2024]).
Answering in the affirmative would not allow an insurer to deny reimbursement based on "any one of the fifty distinct categories of professional misconduct in Education Law § 6530, including relatively minor departures from professional standards" (majority op at 9). Rather, unless we deliberately sabotaged the answer, it would allow an insurer to deny reimbursement based on exactly one category of professional misconduct in Education Law § 6530—subsection 18—and then only for violations that materially threatened to shift medical decsionmaking control from medical professionals to others. Kickback schemes are not "relatively minor departures from professional standards."
Even putting aside our carefully limited precedent and the Second Circuit's narrowly posed question, the costs to investigate violations serve as a real disincentive for insurers to delay reimbursements. Once an insurer receives sufficient evidence of proof of loss, it must pay or deny the no-fault benefit claim within 30 calendar days, or it will owe interest and reasonable attorney's fees (Insurance Law § 5106 [a]; 11 NYCRR 65-3.8 [a] [1]). Interest is charged monthly at a nonnegligible rate of two percent (11 NYCRR 65-3.9 [a])—which would be so high as to constitute civil usury under New York law (General Obligations Law § 5—501[1]; Banking Law § 14-a [1]) were it not authorized by DFS's regulation (see also Department of Financial Service, OGC Op No. 10-09-05 [September 14, 2010] [noting that "(i)nterest is tolled from the date of receipt of the denial of claim until arbitration or a lawsuit is filed"] [emphasis added])[FN7]. Moreover, an insurer "that fails to deny a claim within the 30-day period is generally precluded from asserting a defense against payment of the claim" (Hospital for Joint Diseases v Travelers Prop. Cas. Ins. Co., 9 NY3d 312, 318 [2007]). As a result, an insurer would have no incentive to deny or delay reimbursement and bring litigation only when it is highly confident that the provider's actions clearly fall within the narrow, and egregious, band of conduct.
Despite the majority's attempts to stoke fear, allowing an insurer to deny reimbursement in these circumstances will not "incentivize[] [insurers] to test the threshold" level of fee splitting sufficiently grave to deny payments (majority op at 11). First, as made clear by the comparison of the circumstances in this case, to that of New Way, beyond the grave, material, and willful nature of the conduct, what matters is the incentive structure a given kickback scheme creates to commit fraud on the no-fault system. Second, this reasoning will deter providers from fee splitting in the first place.
Third, DFS itself, in its amicus brief in Mallela, rejected the majority's argument that empowering insurers to raise challenges in circumstances where a medical provider has enmeshed non-providers in its operations would harm accident victims, writing:
"Nor is there any merit to the district court's concern that the Superintendent's intended reading of Section 65-3.16(a) (12)
will delay payment of valid claims. Critically, that provision applies only where health care providers seek reimbursement from insurers after assignment of a claim by an injured person; it does not affect the payment of claims to the injured person herself" (Brief for the Superintendent of Insurance, amicus curiae, at 15, Mallela, 4 NY3d 313).
Curiously, the majority defers to DFS only when DFS says what the majority would like to hear, ignoring what DFS has advised us in the past. Finally, it is the majority's decision that will result in testing the limits of the no-fault scheme, but not by insurers, by providers. The majority's decision leaves providers free to test how far they can push the bounds before they "effectively cede[] control of their professional service corporation to unlicensed individuals" to a level of control sufficiently grave to deny payments (majority op at 14).
Lastly, DFS's concern that allowing insurers to go through the protracted process of litigating an allegedly unreimbursable claim would deprive DFS of its regulatory authority over licensing is a complete red herring. Our decisions in Mallela and Carothers already do that, with DFS's blessing. Moreover, if DFS (a regulatory authority whose raison d'etre in a broad sense is because its processes are simpler, cheaper and faster than the judicial process) simply moves faster than the courts, no judicial usurpation of DFS's regulatory supervision would occur. For that same reason, were DFS to act with even at a modest pace in exercising its regulatory authority, the majority's worry that an insurer will be able to "deny reimbursement based on its unilateral determination that a provider committed professional misconduct" would never transpire (majority op at 7).
The real problem in this case is of DFS's own making. In the last 11 years, DFS has not placed a single provider on its list of providers deemed unauthorized to receive no-fault payments, and lists only 14 entities ever determined to be unauthorized (Providers De-Authorized From Billing New York's No-Fault Auto Insurance System, https://www.dfs.ny.gov/apps_and_licensing/property_insurers/nofault/deauthorized_billers). As a frame of reference, in 2024 alone there were 38,846 claims of no-fault fraud lodged with DFS in 2024 (N.Y. Dep't of Fin. Serv., Investigating and Combating Health Insurance Fraud, at 4, Fig.1 [Mar. 15, 2025]), and, as mentioned above, the dollar volume of no-fault fraud has skyrocketed. Given DFS's own numbers, it should be of no surprise that DFS itself has proclaimed: "The Department has concluded that reasonable fraud-fighting tools must be available to insurers" (NY St Reg, May 9, 2001 at 23. [discussing 11 NYCRR 65-3.5 [e]). It was GEICO, not DFS, who discovered that Mayzenberg's $4,900,000 in claimed reimbursements were part of a fraudulent scheme.[FN8]
Between stimulus and response, there is a space. In that space is the power to choose a response. DFS abdicated its power to choose a response, and insurers and the courts have filled the space.[FN9] Answering the certified question in the affirmative would not disable DFS from responding by filling that space and displacing the courts.
IV.
As should be obvious from the above, DFS is owed no deference here. The majority correctly articulates that "[a]s a general rule, 'courts must defer to an administrative agency's rational interpretation of its own regulations in its area of expertise' " if that interpretation is neither irrational nor unreasonable (Andryeyeva v New York Health Care, Inc., 33 NY3d 152, 174 [2019], quoting Matter of Peckham v Calogero, 12 NY3d 424, 431 [2009]). But we do not defer when an action "is taken without sound basis in [*12]reason or regard to the facts"—that is, when it is irrational (Peckham, 12 NY3d at 431). DFS's interpretation of 11 NYCRR 65-3.16 (a) (12) is an ad-hoc response to litigation via an amicus brief that is inconsistent with DFS's prior amicus briefs in analogous litigation, and DFS fails to present any rational explanation for its change in interpretation.
In Kisor v Wilkie (588 US 558 [2019]) the U.S. Supreme Court articulated additional circumstances, beyond mere rationality, in which a court should decline to defer to an agency's interpretation of its own regulation. The Court noted that an agency's interpretation "must reflect 'fair and considered judgment' " and "that a court should decline to defer to a merely 'convenient litigating position' or 'post hoc rationalizatio[n] advanced' " (id. at 579). An agency's interpretation is less reliable when it is spontaneously formed in response to litigation, as opposed to naturally formed through well-reasoned decision making and bureaucratic processes. Although New York State has yet to develop an analogous doctrine, various cases implicitly acknowledge its merit (see e.g. Andryeyeva, 33 NY3d at 193 [Garcia, J., dissenting] [arguing the Court should not defer to an agency's interpretation that it came to without an "extensive, collaborative process," and noting that "(r)ather than codify rules through the processes required by statute—mandating public notice, hearings, and comments—(the agency) opts to promulgate revised (rules) "under the guise of interpreting a regulation"]; Blue v New York State Off. of Children and Family Services, 206 AD3d 1126, 1131 [3d Dept 2022] [declining to defer to an agency's interpretation that " 'does not reflect a fair and considered judgment' "] [quoting Kisor, 588 US at 579]; Arias v City of New York, 182 AD3d 170, 172 [3d Dept 2020] [same]).
DFS's interpretation of 11 NYCRR 65-3.16 (a) (12) is what Kisor warns against—a post-hoc rationalization made for the purpose of litigation. DFS has no prior publicly stated opinion on this exact issue, and points to no historical decisions nor actions that support its view. In fact, although this litigation has been ongoing since 2018, Mr. Mayzenberg did not argue for deference to DFS until August 2025, because DFS's interpretation of 11 NYCRR 65-3.16 (a) (12) in these precise circumstances was unknown to the Court, and the parties, until it submitted its amicus brief in this matter in July 2025.
Finally, "[a] decision of an administrative agency which neither adheres to its own prior precedent nor indicates its reason for reaching a different result on essentially the same facts is arbitrary and capricious" (Matter of Charles A. Field Delivery Serv., Inc., 66 NY2d 516, 517 [1985]). Whether in regard to a decision, or an interpretation, inconsistent views are inherently irrational (see Frank Lomangino & Sons, Inc. v City of New York, 980 F Supp 676, 681 [EDNY 1997] ["Inconsistent determinations . . . erode the credibility of agency decisionmaking"]; LL 410 E. 78th St. LLC v Div. of Hous. and Community Renewal, 2025 NY Slip Op 01672, 10 [Ct App Mar. 20, 2025] [Wilson, C.J, dissenting] [reasoning that "because (the agency) cannot even consistently explain what it means . . . it should be no surprise that its decisionmaking is chaotic and irrationally inexplicable"]). The majority erroneously states that DFS has "long interpreted 11 NYCRR 65-3.16 (a) (12) as only encompassing pre-licensing requirements" (majority op at 6), when this view has only just emerged. As articulated in detail above, DFS's amicus briefs in Mallela and Carothers are replete with statements of its official position that contradict its proffered interpretation of 11 NYCRR 65-3.16 (a) (12). Although DFS once emphasized a broad based 11 NYCRR 65-3.16 (a) (12) to combat fraud in the no-fault system and minimized concerns regarding reimbursement delays, today it stresses the slippery slope arguments it previously derided and attempts to differentiate fraudulent fee splitting schemes on untenable grounds.
*
* *
To answer the certified question, I would reaffirm that 11 NYCRR 65-3.16 (a) (12) allows insurers to challenge the reimbursability of claims for violations of professional misconduct rules where the substance of the violation is functionally equivalent to the defect in Mallela and Carothers—that is, where the violation allows nonmedical persons to influence medical decisionmaking, such as a kickback scheme in violation of [*13]Education Law § 6530 (18) and 8 NYCRR 29.1 (b) (3). Doing so would not create any slope slipperier that the one we previously laid down, nor impinge on DFS's authority any more than we have already allowed, with its own blessing. To maintain the integrity of the no-fault system, we must focus the substance of an alleged violation, not its form. Answering in the affirmative would not interfere with the no-fault system's ability to provide prompt compensation to accident victims, would avoid the injection of fraud-related costs into the system, and would be most consistent with 11 NYCRR 65-3.16 (a) (12)'s intended purpose, to combat widespread fraud and abuse in the no-fault system.
Instead, the majority has deferred to an agency whose new position is flatly inconsistent with its prior positions and the essence of our prior decisions, so as not to interfere with the agency's discretion to do nothing, even when an insurer could conclusively prove fraud. I would answer the question differently.
Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, certified question answered in accordance with the opinion herein. Opinion by Judge Rivera. Judges Garcia, Singas, Cannataro, Troutman and Halligan concur. Chief Judge Wilson dissents in an opinion.
Decided November 24, 2025

Footnotes

Footnote 1: The Dovmans settled with plaintiffs and voluntarily withdrew their appeals of the District Court's ruling.

Footnote 2: The dissent notes that "it is the provider . . . that would experience any delays" (dissenting op at 14), rather than the patient who assigns their claim, but the no-fault statute prioritizes prompt payouts, and the dissent points to nothing in the statute's text or legislative history that supports an intent only to provide such payouts to patients and not providers.

Footnote 1: This was not a small portion of revenues. GEICO alleges that over the 24-month period leading up to its filing suit (September 2015 to August 2017), the kickbacks Mr. Mayzenberg paid to a third-party were equal to, at a minimum, 79.5% of an entire year of his annual gross receipts.

Footnote 2: Indeed, DFS's reliance on Matter of Allstate Prop. & Cas. Ins. Co. v New Way Massage Therapy P.C. (134 AD3d 495, 495 [1st Dept 2015]) is a further example of form over substance. In that case, the provider was wholly owned by professionals and exercised complete decisionmaking over the acceptance of patients and the services delivered. Only after services were rendered did it outsource its billing and collection functions to an outside entity owned by nonprofessionals, for which it paid 5% of the reimbursements received from insurers to compensate for the outside billing service's efforts. Although the 5% of fees could be termed "fee splitting," it offered no possibility for fraud, because the services had been determined and provided solely by a medical professional without any involvement of the billing agent. Focusing on the form (the billing agent received a small percentage to compensate it for its billing and collections work) instead of the substance (the payment of that fee did not provide any reason to invite fraud or take decisionmaking out of the hands of the medical professionals) mirrors the same mistake made by the majority and DFS on the merits of this case.

Footnote 3: Mr. Mayzenberg's arrangement with the third-party non-provider who referred him patients was not a fee for service model. Rather, the third-party called Mr. Mayzenberg monthly and instructed what amount was owed for the patient referrals. Mr. Mayzenberg paid whatever was demanded, without any record of how the third-party arrived at that amount, revealing an even deeper level of passivity to the third-party's business goals, rather than to his patients.

Footnote 4: The majority suggests that if this is true, GEICO should have attempted to deny no-fault reimbursement because the medical services were unnecessary (see Insurance Law § 5102 [a] [1]; majority op. at 13). Were that avenue sufficient, it would apply with equal force to DFS: DFS should just deny unnecessary claims instead of requiring the Board of Regents to strip the license from a provider. The reason for the rule disallowing all reimbursement to a medical provider that has embroiled nonprofessionals in decisonmaking is to avoid the item-by-item review the majority recommends. Moreover, the majority misses the fact that GEICO was unable to discover Mr. Mayzenberg's unnecessary treatments until it obtained discovery based on the kickback scheme at issue.

Footnote 5: The majority states DFS has long interpreted 11 NYCRR 65-3.16 (a) (12) in this way, pointing to a comment DFS made in its Mallela amicus which states "that the regulation does not encompass professional misconduct 'unless and until the licensing authority actually [takes] . . . disciplinary action. Only at that point would the [provider] be ineligible' " (majority op at 12 [quoting Brief for the Superintendent of Insurance, amicus curiae, at 29, Mallela, 4 NY3d 313]). But the majority omits the larger context of that quoted language: "while an individual health provider's failure to pay child support could constitute 'professional misconduct' that could lead [to license revocation] . . . the [provider] would remain eligible for reimbursement under the No-Fault Law unless and until the licensing authority actually took such disciplinary action" (id.). Examining the majority's selected language in context highlights that DFS was speaking only to the three particular instances the district court below had raised as potential concerns of broadly reading 11 NYCRR 65-3.16 (a) (12), including a provider's "failure to pay child support", "failure to hold an annual meeting" and "failure to pay the appropriate license renewal fees"—which it characterized as "technical or administrative requirements" and which it expressly contrasted to circumstances in which, as here, "the statutory provision in question was intended to protect 'public health or morals' or to prevent fraud" (id. at 28-31 [quoting Galbreath-Ruffin Corp. v 40th and 3rd Corp., 19 NY2d 354, 363-66 (1967)]). Thus, DFS's amicus brief in Mallela supports exactly the line I would draw here, not the majority's conclusion.

Footnote 6: The plain text of 11 NYCRR 65-3.16 (a) (12) does not support this reading. The regulation states that a provider is ineligible for reimbursement "if the provider fails to meet any applicable . . . licensing requirement necessary to perform such service" (11 NYCRR 65-3.16 [a] [12]). Consistent with normal rules of statutory interpretation, the term "any" indicates a broad reading of the term "licensing requirement"—that is, not merely compliance with laws required to obtain a license, but compliance with laws required to keep it. The majority contends that "the Court has generally understood the phrase ['licensing requirement'] as encompassing prerequisites to obtaining a license and lawful operation in a particular regulated area" (majority op at 7). The majority cites only to Matter of Belmonte v Snashall (2 NY3d 560 [2004]) for support this. Matter of Belmonte addressed the definition of "board certified" in the Worker's Compensation Law. The case includes the term licensing requirement once, within a list of what is required to be deemed "licensed and board certified" in accordance with Worker's Compensation Law—that is "meet the State Board of Medicine's and Commissioner of Education's licensing requirements" (id. at 564). Just because prerequisites are licensing requirements does not mean other professional rules are not also licensing requirements (see e.g. Matter of Bell v Board of Regents of Univ. of State of N.Y., 295 NY 101 [1945] [holding that unprofessional conduct of fee-splitting by a licensed dentist warranted discipline even though no regulation of the Board of Regents was violated]).

Footnote 7: The majority attempts to lessen the incentives which weigh against an insurer's decision to deny reimbursement and bring litigation (majority op at 11-12). In its Mallela amicus, DFS disbands similar arguments, noting that insurers are "subject to [] close regulatory oversight" and may request additional verification "only if there are 'valid reasons to do so' — i.e., where the insurer 'has a reasonable belief that a person or entity seeking reimbursement is not properly licensed' " (Brief for the Superintendent of Insurance, amicus curiae, at 27, Mallela, 4 NY3d 313).

Footnote 8: The majority states that "GEICO fails to explain how its interpretation . . . would more effectively address fraud than the current system does" and asks why GEICO did not "report[] to the State their claims that Mayzenberg was paying referral fees" (majority op at 14-15). But the current system forced GEICO to take matters into its own hands and discover this fraud in the first instance.

Footnote 9: In Carothers, DFS took no issue with the court usurping agency power and allowing insurers to deny reimbursement when a jury had found the provider took part in fraudulent conduct. It is unclear why the circumstances in this case should lead to a different result.